**Dr. Endre UNGAR, et al., Appellants,**

v.

**William French SMITH, Attorney General of the United States.**

No. 80–1591.

United States Court of Appeals, District of Columbia Circuit.

Argued June 17, 1981.

Decided Oct. 30, 1981.

Robert H. Reiter, Washington, D. C., for appellants.

Charles F. Flynn, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before BAZELON and McGOWAN, Senior Circuit Judges, and WILKEY, Circuit Judge.

Opinion for the court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

This appeal is taken from a dismissal by the District Court of appellants' complaint on the ground that the challenged action of the Department of Justice was not reviewable. The Department of Justice had denied appellants' claims for the return of certain assets vested in the Office of Alien Property and derived from property formerly owned by a Hungarian pharmaceutical company that had been seized during the Second World War under the Trading with the Enemy Act. Although claimants relied upon legislation specially passed by Con-

gress to aid at least some of them, the Department of Justice held that they had failed to establish their statutory entitlement to the vested funds. Finding that the administrative process accorded these claimants was constitutionally deficient, and that Congress did not intend to foreclose judicial review of unconstitutional administrative action in these circumstances, we vacate the decision of the District Court in part, affirm in part, and remand for further proceedings.

## I

The story of the appellants,[1] insofar as it relates to the case at bar, begins in Hungary, a country that allied itself with Nazi Germany during the Second World War. According to the complaint, appellants owned and operated Chinoin Chemical and Pharmaceutical Works, Ltd., a Hungarian corporation that clandestinely supplied the Allies with sulfa drugs and other medicines. Complaint, ¶¶ 2–3. Chinoin, as a corporation organized under the laws of an enemy nation, fell within the definition of "enemy" found in the Trading with the Enemy Act, 50 U.S.C.App. § 2 (1976). Accordingly, during the war the Alien Property Custodian took control of certain assets belonging to the corporation, including patents, trademarks, and rights to various manufacturing processes. Appendix at 67–68. From the liquidation of these properties, the Office of Alien Property realized $239,616.47. Id. at 68.

Some corporate directors were sent to concentration camps. One, the father of appellant Susan Gyarmati, died there. Another, appellant Dr. Endre Ungar, survived. A third appellant, Ernest Szekely, also survived the war. To keep the firm away from the German cartels of I. G. Farben and Schering, the directors also transferred Chinoin stock to appellants Sandoz Chemical Factory, Ltd., a Swiss firm, and National Securities Corp., Ltd., a British company. Complaint ¶¶ 2–3.

In April, 1949, the appellants, other stockholders, and the corporation filed claims for the return of Chinoin assets vested in the Office of Alien Property under the administrative return provisions of the Trading with the Enemy Act, 50 U.S.C.App. § 32 (1976). Eight years later, the Office of Alien Property denied the claims on the grounds that (1) Chinoin was an "enemy" according to the definition in section 2 and (2) appellants as shareholders lacked the requisite direct interest in the vested property. App. at 68.

Unable to obtain relief from the Department of Justice, appellants sought remedial legislation in Congress. In 1968, after earlier efforts had not achieved success, see S.Rep.No. 684, 89th Cong., 1st Sess. (1965); S.Rep.No. 1419, 86th Cong., 2d Sess. (1960), the Congress did pass Pub.L. 90–421, which had been amended on the Senate floor to include a provision allowing shareholders who were persecuted citizens of enemy nations to seek the return of corporate assets vested in the Office of Alien Property. The legislation was codified at 22 U.S.C. § 1631o (1976).

Appellants filed new claims based upon section 1631o on December 19, 1968 and January 13, 1969. The Office of Alien Property informed appellants' counsel that they would "be advised further after we have had the opportunity to review the record relating to these matters." App. at 5. The next correspondence that appears in the record is dated October 5, 1978. It is a letter from the Director of the Office of Alien Property to counsel for appellants, informing him that the office was about to close, that there was nothing in their records following the submission of the claims, that the claims might be disallowed for failure to prosecute, and requesting counsel to advise the Department of Justice "whether or not claimants will consent to withdrawal of these claims, or in the alternative, your present position thereon." App. at 7.

---

1. Although no formal motion to dismiss was filed under Fed.R.Civ.P. 12(b)(6), we think that the District Court's dismissal without any hearing or presentation of documentary evidence requires that, on appeal, this court regard the material allegations of fact in the complaint as true. See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 (1969).

Appellants, through their attorney, responded on October 11 by stating that they had no intention of withdrawing their claims and suggesting a conference with officials in the Alien Property Office. App. at 8.

On February 1, 1979, Bruno A. Ristau, then Director of the Office of Foreign Litigation, wrote to appellants' counsel to inform him that he had been asked by the Assistant Attorney General in charge of alien property to look into the Chinoin claims. He wrote in part:

Candor requires me to tell you that— despite my general familiarity with the Trading with the Enemy Act—I do not understand the nature of the claims which you seek to assert. Moreover, I fail to understand why you have taken no steps since the filing of these claims in 1968 to perfect them. On their face, they appear to me not to be cognizable under any provision of the Trading with the Enemy Act.

App. at 9. On July 13, 1979, appellants' counsel sent various materials intended to support the claims of his clients and asked to be informed on which other points the Department of Justice required additional documentation. App. at 11. It is not entirely clear from the record what documentation was submitted on July 13.

In the meantime, the Department of Justice had not been idle. It had found the file; specifically, the 1968 letters. App. at 12–13. In addition, in a letter of July 26, 1979, it informed appellants that they "literally ha[d] until mid-August *at the very latest* to perfect the claim(s)" (emphasis original). App. at 12.

The Department of Justice letter of July 26 was perhaps most significant because it stated for the first time what evidence the appellants were required to adduce in support of their claims. The letter said that it was the appellants' "obligation to substantiate with probative evidence," within the three week deadline that the Department had imposed, (1) the identity of the claimants, (2) their stock interests in Chinoin, (3) the total number of shares of Chinoin stock, and (4) current powers of attorney in favor of appellants' counsel. App. at 13.

On August 21, 1979, counsel for appellants responded by submitting copies of the legislative history of 22 U.S.C. § 1631*o*, and information on Chinoin from the 1941 edition of *Compass*, a European reference work on business. App. at 15–16. Counsel explained that his efforts to obtain material about Chinoin stock from the Registry of Corporations in Budapest had not yet succeeded. *Id.* at 15. He also enclosed copies of powers of attorney in his favor and said that new authorizations would be forthcoming. *Id.* at 16.

The Department of Justice regarded this submission as "wholly unresponsive" to its July 26 letter. App. at 17. In addition, the Department's letter of August 30 stated that appellants still had not submitted "a *fully-documented claim*" (emphasis original). *Id.* The letter, from Bruno A. Ristau, stated, "You seemingly continue to be under the impression that this office is somehow obligated to prepare the claim on behalf of your clients. I have sought to disabuse you of this notion repeatedly," *id.*, and warned appellants that he would recommend disallowance of the claim on September 30, 1979 if no suitable evidence was forthcoming, *id.* at 18.

Appellants' counsel submitted further materials. App. at 19–36. In a letter of November 9, 1979, the Department of Justice stated that it had "reviewed with care" the materials and had on that basis "no choice but to recommend to the Attorney General that the claims be denied." *Id.* at 37. The Department found the powers of attorney insufficient because they had been transferred from a New York City lawyer who was not currently on the register of practicing attorneys in New York, *id.* at 38–39.

The Department tentatively concluded that none of the claimants had demonstrated their entitlement to the assets vested with the Office of Alien Property. It regarded National Securities Corp., Ltd. and Sandoz Chemical Works as ineligible for relief under section 1631*o* because they

were, according to their own claims, nonenemy enterprises, not persecutees of enemy nationality. App. at 40. Appellant Ungar had not shown that he owned any Chinoin shares at the time of vesting, 1942–44. *Id.* Appellant Susan Gyarmati had not demonstrated that she had inherited Chinoin shares from her father. The Department of Justice said that it "expected to be furnished copies of the probate record of [her father's] testament in Belgium." *Id.* at 40–41. Finally, appellant Ernest Szekely was thought by the Department to be ineligible because it appeared that he lived until 1943 in France and after that time in England. Although the Department's letter did not say so explicitly, the implication was that he was not persecuted by Hungary. In addition, no showing with respect to his ownership of Chinoin shares between 1942 and 1944 had been made. *Id.* at 41.

On January 17, 1980, Mr. Ristau sent counsel for appellants a copy of a memorandum prepared for the Attorney General which recommended denial of the claims, and invited counsel to submit written exceptions within 30 days. App. at 42. The memorandum covered in more detail the objections outlined by the Department in its November 9 letter. A final version of the memorandum was submitted to the Assistant Attorney General on March 24, 1980. According to it, counsel for appellants had submitted nothing in response to the draft memorandum. *Id.* at 72. On April 7, 1980, Assistant Attorney General Alice Daniel issued an order denying appellants' claims. *Id.* at 62–64.

The instant lawsuit had been filed some time earlier. On September 28, 1979, appellants had sued to obtain (1) an order requiring the Department of Justice to rule upon the claims, (2) a preliminary injunction preventing transfer of the assets to the War Claims Fund pending disposition of the suit, (3) the return of the assets and (4) whatever further relief the court deemed proper. The matter was held in abeyance as the administrative process in the Department of Justice reached a consummation. On April 28, 1980, counsel for appellants submitted a status report, to which he appended a copy of what he stated were exceptions to the Department of Justice memorandum filed in response to the January 17 letter. These exceptions, which, as noted above, appellees do not state that they received, were principally directed to the difficulties inherent in obtaining or reconstructing Hungarian and other relevant corporate records. Counsel for appellants wrote:

> ... [T]he only two persons with intimate knowledge of the circumstances who survived were Dr. Endre Ungar, who was born on May 30, 1890, and is approaching ninety years of age, and Ernest Edgar Szekely, born in Budapest, as was Dr. Ungar, on March 22, 1895, being five years younger. Dr. Ungar described the elaborate steps taken during the period of nazi occupation to disguise the foreign interests in Chinoin, in memoranda to claimants' counsel, and the undersigned counsel travelled to Mexico City recently, after learning for the first time that the presentation that had been made did not satisfy the Director of the Office of Foreign Litigation, only to find that Dr. Ungar was unable due to illness to spend the time or to concentrate sufficiently to assist. . . . Given time, it is possible to obtain evidence, hopefully in the form of a detailed statement from Dr. Ungar, supported by other evidence, including statements or depositions from the other claimants as suggested by the Chief of the Office of Foreign Litigation, but this necessitates Dr. Ungar's assistance upon his recovery.

App. at 82–83.

Although no formal motion to dismiss appears on the docket, the District Court issued an order on April 29, 1980 denying the request for a preliminary injunction as moot and dismissing the complaint. In an accompanying memorandum, it explained that the issuance of the administrative decision denying the claims mooted the request for an injunction to compel a final decision. The District Court refused to allow the claimants to pursue the return of the assets through the judicial process because the language of section 1631*o* precludes judicial

review of "[d]eterminations by the designee of the President or any other officer or agency with respect to claims under this section, including the allowance or disallowance thereof .... "

## II

Before proceeding any further with consideration of the appeal, we are confronted with a serious challenge to the power of this or any other court to review an administrative decision with respect to claims filed under section 1631*o*. The District Court noted that determinations made under section 1631*o* were, according to statute, to be "final" and "not ... subject to review by any court." 22 U.S.C. § 1631*o*(c) (1976).

Appellees place heavy reliance upon the case of *Schilling v. Rogers*, 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960), in which the Supreme Court held that the Trading with the Enemy Act insulated the decisions of the Office of Alien Property from judicial review. The provisions at issue in *Schilling* were 50 U.S.C.App. § 7(c) (1976), which states that the "sole relief and remedy" of any claimant is that provided by the Act, and 50 U.S.C.App. § 32 (1976), which allows certain persons, including persecutees of enemy nationality, to petition the Office of Alien Property for the return of their assets. Reading those provisions in the light of the legislative history of the Trading with the Enemy Act, Justice Harlan, writing for the Court, concluded that an administrative finding of no persecution sufficient to establish claimant's eligibility was unreviewable.

Therefore, the *Schilling* decision can fairly be read as indicating that the courts may not review the administrative agency's findings of fact when Congress has expressly precluded review, if, as in *Schilling*, the claimant has not raised any issues of constitutional dimension. *Accord, N. V. Handelsbureau La Mola v. Kennedy*, 299 F.2d 923 (D.C.Cir.), *cert. denied*, 370 U.S. 940, 82 S.Ct. 1582, 8 L.Ed.2d 808 (1962); *Tiedemann v. Brownell*, 222 F.2d 802 (D.C.Cir.1955); *Hawley v. Brownell*, 215 F.2d 36 (D.C.Cir. 1954).

When, however, plaintiff seeks to invoke the aid of the judicial branch on constitutional grounds, the Supreme Court and this court have both indicated that only the clearest evocation of congressional intent to proscribe judicial review of. constitutional claims will suffice to overcome the presumption that the Congress would not wish to court the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution.

In *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), the Supreme Court held that 38 U.S.C. § 211(a) (1976), barring judicial review of determinations made by the Veterans Administration with respect to the eligibility of veterans for various benefits, did not bar judicial cognizance of a claim that the veterans' benefits laws unconstitutionally discriminated against conscientious objectors. The Court, observing that construing the statute as a prohibition of judicial authority to determine the constitutionality of statutes "would ... raise serious questions concerning the constitutionality of § 211(a)," 415 U.S. at 366, 94 S.Ct. at 1165, concluded that only " 'clear and convincing' evidence of congressional intent" to deny plaintiffs a judicial forum for their constitutional claims could lead a court to close its doors to those plaintiffs. *Id.* at 373–74, 94 S.Ct. at 1168–69.

Relying on *Robison*, this court has stated that the same standard will be applied when the Government asserts that Congress intended a general proscription of judicial review to bar judicial cognizance of a claim that an administrative agency, in applying the statute, acted unconstitutionally. *Ralpho v. Bell*, 569 F.2d 607 (D.C.Cir.1977); *accord, Devine v. Cleland*, 616 F.2d 1080, 1084–85 (9th Cir. 1980) (administration of 38 U.S.C. § 211(a) (1976)). In certain respects, *Ralpho* is factually similar to this case and, for that reason, warrants some discussion.

The case concerned the claim of a Micronesian resident, Ralpho, for the destruc-

tion of his house by aerial bombing during the Second World War. 569 F.2d at 612. In their peace treaty, and in a later agreement, the United States and Japan agreed to compensate persons like Ralpho who had suffered as a result of the war. *Id.* at 612–13. To implement the compensation plan, Congress passed legislation establishing a Micronesian Claims Commission to rule on all claims. The statute provided that any Commission award "shall be final and conclusive for all purposes . . . and not subject to review." *Id.* at 613.

The court read that language, which is very similar to that used in section 1631o, as not prohibiting judicial consideration of Ralpho's claim that the Commission procedures were violative of due process. *Id.* at 618–22. Judge Robinson, writing for the court, found *Johnson* controlling even though that case involved an attack on the constitutionality of a statute, not the procedures by which it was implemented. The court explained:

> But if legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitutionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well. Not only is it daring to suggest that Congress, though subject to the checks and balances of the Constitution, may create a subordinate body free from those constraints; it also beggars the imagination to suggest that judicial review might be less crucial to assuring the integrity of administrative action than it is to make certain that Congress will operate within its proper sphere. If the courts are disabled from requiring administrative officials to act constitutionally it is difficult to see who would perform that function. We say that a statute purporting to foreclose judicial redress of constitutional violations allegedly perpetrated by an administrative agency must be construed in accord-

ance with the standards articulated in *Johnson v. Robison.*

*Id.* at 620 (footnotes omitted).

We do not perceive any alternative open to us other than to apply *Ralpho* to the instant case. This means that we must inspect the legislative history of section 1631o with some care to determine if Congress intended to foreclose review of constitutional claims, and, if no intent of that nature appears in the materials relating to that provision, we will presume that Congress did not intend to proscribe review of appellants' colorable claims that the Department of Justice acted unconstitutionally.

The legislative history of section 1631o indicates that it was intended to fill the interstices between the Trading with the Enemy Act and the International Claims Settlement Act. Under the latter statute, nonenemy stockholders of enemy corporations could file claims for their share of vested corporate assets. 22 U.S.C. § 1631f (1976). Under the Trading with the Enemy Act, those of enemy citizenship who were nonetheless persecuted by their own countries could petition for the return of their assets under section 32, 50 U.S.C.App. § 32 (1976). The interests of stockholders, however, as appellants discovered in 1957, did not qualify for section 32 relief, and, as technical enemies, the noncorporate appellants could not seek return of Chinoin assets by filing a claim under section 1631f. Senator Morse, who introduced the provision now at issue as an amendment to other international claims legislation, indicated on the floor of the Senate that the bill, although cast in terms general enough to fill the gap between the existing statutes, was intended primarily to benefit these appellants. 113 Cong.Rec. 35378 (1967). The conference report stressed this point:

> This Senate amendment contained language intended to eliminate certain inequities in the present law by permitting the return to persecutees and nonenemy nationals of the proportionate share of [certain] corporations. . . . [T]he amendment will affect four stockholders, or

their heirs, of the Chinoin Chemical & Pharmaceutical Works, Ltd., a Hungarian firm. The claimants dealt with here have never been American citizens but were persecuted by their own governments during World War II.

H.R.Rep.No.1648, 90th Cong., 2d Sess. (1968), *reprinted in* 114 Cong.Rec. 20684 (1968), U.S.Code Cong. & Admin.News, 2710, 2724.

The legislation had the support of the executive branch. During hearings held in 1964, Ely Maurer, an Assistant Legal Adviser of the Department of State, stated:

> There would appear to be no valid reason for making a distinction between nonenemy nationals and persecutees since both categories are considered as having nonenemy character; nor for making a distinction between vested assets under the Trading With the Enemy Act and ... under ... the International Claims Settlement Act. It is to effectuate fair treatment in these two respects that the legislation is needed.
>
> I hope the time is at hand when we can have this legislation, for it is an old principle that justice delayed is justice denied, and it has been denied a long time.

113 Cong.Rec. 35378 (1967).

Although the legislative history is pervaded by expressions of concern for the appellants at bar, and by a desire to return the vested assets of Chinoin to them, there is no reference to the proscription of judicial review contained in section (c) with which we are presently occupied. We therefore turn to the legislative histories of section 1631*o*'s relatives, the Trading with the Enemy Act and the International Claims Settlement Act, to ascertain what limits Congress saw itself as imposing upon judicial review of determinations made under those statutes.

Under section 207 of the International Claims Settlement Act, 22 U.S.C. § 1631f (1976), nonenemy shareholders of enemy corporations may file a suit in equity to obtain return of their share of corporate assets, or the claimant may elect administrative proceedings with subsequent judicial review available. The legislative history states only that the election is intended to reduce the delay that has resulted in adjudicating claims under the Trading with the Enemy Act, which permitted certain nonenemy claimants to obtain administrative relief and then file a suit in District Court for a *de novo* determination. H.R.Rep.No.624, 84th Cong., 1st Sess. 8 (1955). Section 207, therefore, provides scant assistance to those confronted with the necessity of interpreting the nonreviewability language of section 1631*o*(c).

The legislative history of section 32 of the Trading with the Enemy Act similarly does not demonstrate a clear congressional intent to foreclose review of constitutional claims. Section 32 was added to the Trading with the Enemy Act in 1946. P.L. 79–322, 60 Stat. 50 (1946); *see also* H.R. Rep.No.1269, 79th Cong., 1st Sess. 3 (1945), U.S.Code Cong. & Admin.News, p. 1101. Neither the House Report, *id.*, nor the Senate Report, S.Rep.No. 920, 79th Cong., 2d Sess. (1946), contains any explanation of the proscription of judicial review that resulted from reading new section 32, providing an administrative remedy, with old section 7, limiting remedies under the Act to those specifically enumerated therein. The legislative history of the amendment that included persecutees within the ambit of section 32 is similarly unrevealing. *See* H.R. Rep. 2398, 78th Cong., 2d Sess. (1948).[2]

---

**2.** An earlier version of the bill containing the amendments to section 32, H.R. 6890, had also included an elaborate scheme for trial of just-compensation claims in the Court of Claims. This provision was deleted on the House floor for reasons that are not wholly plain. 92 Cong. Rec. 10215–18 (1946). We are not willing to regard this as clear evidence of Congressional intent when it appears that Congress was motivated by a desire not to expose the United

States to financial liability beyond whatever assets were vested in the Alien Property Custodian, *see id.* In addition, the Alien Property Custodian, commenting on the amendments, did not understand them to insulate his office from a Taking Clause action: "[I]t must be recognized that the courts may still hold in pending litigation that an implied remedy of just compensation exists, although ... this would be under the Tucker Act rather than

■ Our inspection of the sources discussed above has failed to discover anything that might be considered a clear expression of Congress's desire to prevent the courts from passing upon the constitutional claims of those seeking the return of vested assets. We therefore conclude that section 1631*o*(c) does not bar consideration of whatever constitutional issues these appellants tender, and accordingly direct our attention to them.

### III

■ In reviewing the actions of the Department of Justice for constitutional infirmity, we reach the conclusion that the individual appellants, although entitled to procedural due process, were denied it. We think that section 1631*o* provided them with a protected property interest in the vested assets sufficient to impose the dictates of due process upon the administrative determination that they were not to obtain them. While we have no desire to dictate precisely what procedures must be followed to fulfill the requirements of due process, we are quite certain that in the context of this case, the amount of time granted appellants to prepare their claim, following almost ten years in which the Government did, for aught that the record shows, nothing whatsoever, cannot possibly be considered adequate.

The inquiry into the application of due process to administrative action can be conveniently divided into two questions: (1) is process due? and (2) if so, what process is due? The answer to the first question depends upon the existence *vel non* of either a liberty or property interest arguably protected by the Fifth or Fourteenth Amend-

ment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A property interest for these purposes is a legitimate expectation of entitlement to something of value. *Id.* at 577, 92 S.Ct. at 2709. The legitimate expectation must be grounded in a source of law other than the due process clauses of the Fifth or Fourteenth Amendment. *Id.*

We think that 22 U.S.C. § 1631*o* (1976) constitutes a source of law that would engender in the minds of the individual claimants, and apparently has engendered, the expectation that they are entitled to the vested assets. The language of the statute states that a persecutee of enemy nationality "shall be eligible hereunder to receive the return of his interest in property . . ." We have been unable to find a case in which a claimant who demonstrates his eligibility for vested assets has been denied at least his proportionate share of the available assets. If any more assurance were needed, the abundant references in the legislative history to the right of these appellants to regain these assets would lead them to presume an entitlement.

Although the Fifth Amendment's guarantee of due process does not prohibit the summary seizure and appropriation of property owned by aliens who are clearly enemies, *United States v. Chemical Foundation*, 272 U.S. 1, 11, 47 S.Ct. 1, 4, 71 L.Ed. 131 (1926); *N.V. Handelsbureau La Mola v. Kennedy*, 299 F.2d 923, 926 n.5 (D.C.Cir.), *cert. denied*, 370 U.S. 940, 82 S.Ct. 1582, 8 L.Ed.2d 808 (1962), that general rule does not defeat the individual appellants' right to due process in this case. Congress passed section 1631*o* in order to allow return of property to persons like the individual ap-

under the Trading with the Enemy Act." 92 Cong.Rec. 12486 (1946).

Nor does *Schilling v. Rogers*, 363 U.S. 666, 671–74, 80 S.Ct. 1288, 1292–94, 4 L.Ed.2d 1478 (1960), arrive at a contrary reading of congressional intent. The *Schilling* Court framed its inquiry into the legislative history of section 32 as a search for evidence indicating congressional intent to *provide* judicial review, not, under the more stringent standard it announced later with respect to constitutional claims, to *prohibit* review limited to those claims. And, of

course, it is worth observing that four justices of the Supreme Court, Chief Justice Warren, and Justices Black, Douglas, and Brennan, read those same legislative materials as providing a right of judicial review as contemplated by the Administrative Procedure Act. It is difficult, therefore, to read *Schilling* as implying that there is a clear congressional intent to insulate decisions with respect to the claims of technical enemies from review on the basis of constitutional error.

pellants, despite its general policy of not returning vested property formerly owned by enemies. H.R.Rep.No.1269, 79th Cong., 1st Sess. 2, 8–9 (1945); *Guessefeldt v. McGrath*, 342 U.S. 308, 316, 72 S.Ct. 338, 343, 96 L.Ed. 342 (1952). That clear congressional choice created an entitlement protected by the Fifth Amendment, despite the appellants' association with an enemy country.

We reach a different conclusion with respect to the two corporate claimants. Section 1631*o* allows one "formerly a national of Bulgaria, Hungary, or Rumania" to seek return of his interests in corporate property. According to the complaint, the corporate claimants are of Swiss and British registry. Therefore, we do not understand that they are eligible for relief under section 1631*o*. If ineligible, they cannot rely upon the statute as a basis for their entitlement to Chinoin's vested assets. Without an entitlement, they do not have a protected property interest and cannot invoke the principles of procedural due process on their behalf.

█ Having concluded that these appellants are entitled to due process, we must consider what process is due, a decision that involves a balance between the interests of the claimants and of the Government, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C.Cir.1981). The usual points of dispute—the necessity *vel non* and the timing of an oral hearing—do not appear to be implicated in this case. We understand the gravamen of appellants' complaint to be that they were not provided sufficient time to prepare their case, and we think that due process requires that they be given some reasonable additional amount of time. We infer from appellants' exceptions that they are concerned that the

Department of Justice will only accept certain types of evidence and therefore refuse to consider other relevant and probative evidence. Whether this is the case is difficult to determine on the record before us; we do understand that this court has taken a dim view of similar practices. In *Carter v. Cleland*, 643 F.2d 1, 6–7 (D.C.Cir.1980), this court indicated its concern that the Veterans Administration would invariably infer from evidence that applicant had borne a child by another man the conclusion that applicant intended to terminate her marriage to the veteran without considering whatever relevant evidence of contrary intention that the woman could present. This court said that the VA had the "responsibility" to consider whatever probative evidence was submitted to it.

We think that the same burden may reasonably be imposed upon the Department of Justice. In other words, appellants' failure to produce Hungarian corporate records need not be fatal if they can proffer other evidence tending to support the elements of their claim. The Department of Justice remains free to determine the weight and sufficiency of their evidence. The exact procedures to be followed should be worked out between the Government and the appellants on remand, as we will explain in Part IV *infra*.

### IV

The procedures vouchsafed the individual appellants to demonstrate their entitlement to the vested assets were not consistent with the requirements of due process of law. The decision of the District Court is vacated with respect to the individual appellants and affirmed with respect to the corporate appellants.[3] This case must be remanded to determine what procedures

---

3. We do not think that our partial affirmance of the District Court should affect the ability of the individual claimants to obtain relief. The statute only requires that 25% of the stock be owned by nonenemies or persecuted enemies, not that 25% of the stockholders be eligible for relief under section 1631*o*. The claimants have alleged that more than 25% of the Chinoin stock was held by persons in those two catego-

ries. App. at 75–76. The statute also allows claimants, in lieu of showing 25% ownership, to demonstrate that the corporation was subject to special laws based upon the "enemy character ... of its stockholders." The confiscation of corporate stock alleged in the complaint might be enough to qualify under that category, which, it must be remembered, was drafted with Chinoin in mind.

the Department of Justice should adopt in its consideration of the claims. We did not specify those procedures in this opinion because we do not know what evidence the appellants would like to submit, or if that evidence is relevant. On remand, we think that the appellants should specify the evidence they would proffer, and that the parties should arrive at procedures to ensure that relevant evidence is duly considered by the Department of Justice. We hope that the parties will be able to settle this aspect of their dispute; if not, the District Court, on the basis of the contentions brought forward upon remand, should determine the administrative procedure to be followed. The decision with respect to the entitlement *vel non* of these appellants to the vested assets at issue is then for the Department of Justice to make.

*It is so ordered.*