The HONORABLE JOHN H. McBRYDE, United States District Judge for the Northern District of Texas, Appellant,

v.

COMMITTEE TO REVIEW CIRCUIT COUNCIL CONDUCT AND DISABILITY ORDERS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, et al., Appellees.

No. 00–5016.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 2000.

Decided Sept. 21, 2001.

David Broiles and Arnon D. Siegel argued the cause and filed the briefs for appellant.

William B. Schultz, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee United States of America. David W. Ogden, Assistant Attorney General, Mark B. Stern and Scott R. McIntosh, Attorneys, and Wilma A. Lewis, U.S. Attorney at the time the brief was filed, were on the brief. Thomas W. Millet, Attorney, U.S. Department of Justice, entered an appearance.

Robert B. Fiske, Jr. argued the cause for appellees the Committee to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States, et al. With him on the brief was Lowell Gordon Harriss.

Before: WILLIAMS and TATEL, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Separate opinion filed by Circuit Judge TATEL, concurring in part and dissenting in part.

STEPHEN F. WILLIAMS, Circuit Judge:

On December 31, 1997 the Judicial Council of the Fifth Circuit (the "Judicial Council" or "Council"), acting under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. § 372(c) (the "Act"), imposed sanctions on the Honorable John H. McBryde, United States District Judge for the Northern District of Texas. The sanctions followed a two-year investigation by a Special Committee of the Judicial Council ("Special Committee"), including nine days of hearings. The Committee took evidence relating to incidents spanning the entirety of Judge McBryde's judicial career and involving encounters with judges and lawyers both inside and outside his courtroom. (We will consider an example from the exhaustive record when we address Judge McBryde's argument that the Council illegally considered the merits of his judicial decisions.)

The investigation culminated in a 159-page report in which the Special Committee concluded that "Judge McBryde ha[d] engaged for a number of years in a pattern of abusive behavior" that was " 'prejudicial to the effective and expeditious administration of the business of the courts.' " *Report of the Special Committee of the Fifth Circuit Judicial Council Regarding Complaints Against, and the Investigation into the Conduct of, Judge John H. McBryde* at 150–51 (Dec. 4, 1997) ("Committee Report") (quoting 28 U.S.C. § 372(c)). The Report also recommended a variety of sanctions based on the provisions of § 372(c)(6)(B): that Judge McBryde receive a public reprimand, pursuant to subsection (v); that no new cases be assigned to him for a year, pursuant to subsection (iv); and that he not be allowed for three years to preside over cases involving any of 23 lawyers who had participated in the investigation, pursuant to subsection (vii) (providing for "other action" considered appropriate in light of circumstances). See Committee Report at 152–58. The Judicial Council endorsed the recommendations and issued an order imposing the recommended sanctions. See *In re: Matters Involving United States District Judge John H. McBryde, Under the Judicial Conduct and Disability Act of 1980*, No. 95–05–372–0023 (Jud. Council

5th Cir. Dec. 31, 1997) ("Judicial Council Order"). The lawyer-related disqualification became effective on February 6, 1998, but the Council stayed the reprimand and the one-year suspension pending review by the Committee to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States (the "Review Committee"). On September 18, 1998 the Review Committee substantially affirmed the Council's action and lifted the stay. See *In re: Complaints of Judicial Misconduct or Disability*, No. 98–372–001 (Jud. Conf. U.S. Sept. 18, 1998) ("Judicial Conference Report").

Soon thereafter Judge McBryde brought suit in district court, claiming that the Act, both facially and as applied, violated the due process clause and the Constitution's separation of powers doctrine.[1] He also claimed that the initiation and conduct of the investigation against him exceeded the authority granted by the statute. Finally, he posed a First Amendment challenge to the Act's restrictions on disclosing the record of the proceedings. On cross motions for summary judgment, the district court agreed with Judge McBryde's First Amendment argument, *McBryde v. Committee to Review Circuit Council Conduct and Disability Orders*, 83 F.Supp.2d 135, 171–78 (D.D.C.1999), but rejected the rest. Only Judge McBryde appealed; here he repeats the essence of his remaining arguments.

Judge McBryde's claims are moot insofar as they distinctively relate to the one-year suspension, which expired on September 18, 1999, and the three-year disqualification, which expired on February 6, 2001. Certain of the non-moot claims are barred by the Act's preclusion of judicial review,

28 U.S.C. § 372(c)(10), namely the "as applied" and statutory challenges; the district court was therefore without jurisdiction to hear them. We vacate the district court's judgment insofar as it addressed the moot or precluded issues. Judge McBryde's remaining constitutional challenges fail on their merits; we therefore affirm the district court's ruling. We address first mootness, then preclusion, and finally the merits.

\*     \*     \*     \*     \*     \*

Article III, Section 2 of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot. See, e.g., *Church of Scientology of California v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). This requirement applies independently to each form of relief sought, see *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), and "subsists through all stages of federal judicial proceedings, trial and appellate," *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990).

The one-year and three-year bans have expired. No relief sought in this case would return to Judge McBryde the cases he was not assigned or otherwise improve his current situation. These claims will therefore be moot unless they are "capable of repetition, yet evading review." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Both the Supreme Court and this court have held that "orders of less than two years' dura-

---

1. Defendants/Appellees in this case are the Review Committee; Judge William J. Bauer, individually and as Chairman and as member of the Review Committee; the Judicial Council; and Judge Henry J. Politz, individually and as Chief Judge of the Court of Appeals for the Fifth Circuit and as presiding member of the Judicial Council, at the relevant times.

tion ordinarily evade review." *Burlington Northern R.R. Co. v. Surface Transp. Bd.,* 75 F.3d 685, 690 (D.C.Cir.1996); see also *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 514–16, 31 S.Ct. 279, 55 L.Ed. 310 (1911). So the one-year exclusion safely qualifies. We will assume in Judge McBryde's favor the same for the three-year exclusion.

But are the injuries "capable of repetition"? Stated more formally, this requires "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein,* 423 U.S. at 149, 96 S.Ct. 347. When considering the likelihood that an injury will be repeated, the Supreme Court has in general "been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Honig,* 484 U.S. at 320, 108 S.Ct. 592 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Murphy v. Hunt,* 455 U.S. 478, 484, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). *Honig* created an exception to this general principle on the ground that there it was the disabled respondent's "very inability to conform his conduct to socially acceptable norms that render[ed] him 'handicapped.'" 484 U.S. at 320, 108 S.Ct. 592. We have no basis for concluding that there is any parallel inability here.

In the cases cited by *Honig* the parties did not challenge the underlying laws that proscribed their potential future conduct. See, e.g., *O'Shea,* 414 U.S. at 496–97, 94 S.Ct. 669. McBryde obviously does challenge the Act and the *authority* of the defendants to enforce norms of judicial conduct. But he does not appear to challenge the norms themselves. To be sure, he asserts that the Special Committee's report is vague and provides inadequate notice of what actions are prohibited. But the fundamental standard sought to be enforced by the defendants can plainly be discerned—that a judge should demonstrate at least a modicum of civility and respect towards the professionals with whom he or she works. The standard is also familiar, as it clearly echoes Canon 3(A)(3) of the Code of Judicial Conduct for Federal Judges. See Code of Judicial Conduct for United States Judges, Canon 3(A)(3); Judicial Council Order at 2. Judge McBryde does not, so far as we can determine, ever challenge this basic notion anymore than the plaintiff in *Lyons* claimed a right to engage in the sort of conduct that (he said) commonly led to police use of chokeholds. Indeed at oral argument counsel for Judge McBryde specifically acknowledged that at least some of the conduct "could be considered inappropriate." See Oral Arg. Tr. at 80–81. With this decision's confirmation of the Judicial Council's authority to sanction Judge McBryde for consistent failure to adhere to this norm, we think the risk of recurrence fairly slight. We recognize that docket limitations can be a very serious matter. See *Wozniak v. Conry,* 236 F.3d 888, 890 (7th Cir.2001) (holding that depriving a tenured professor of *all* teaching and research responsibilities affected a property interest sufficiently to entitle him to some kind of a hearing). But here the two restrictions on Judge McBryde's docket have become moot.

The dispute over the public reprimand, however, remains alive. Any thought that the reprimand is a past and irreversible harm is belied by the fact that it continues to be posted on the web site of the Fifth Circuit Court of Appeals,[2] with a

---

**2.** See <http://www.ca5.uscourts.gov/mcbryde. htm>, last accessed on June 20, 2001.

link on the home page alongside items for current use such as the court's calendar and opinions.[3] Even absent that use of modern technology it would be a part of the historical record. Were Judge McBryde to prevail on the merits it would be within our power to declare unlawful the defendants' issuance of stigmatizing reports and thereby to relieve Judge McBryde of much of the resulting injury.

█ No one has suggested that this injury to reputation is not enough to afford Judge McBryde standing (the three-year limit was in effect at the time of oral argument). But we have a duty to be sure of our own jurisdiction, see *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), so we consider the question. The Court has, of course, ruled that mere injury to reputation is not enough of an impingement on a person's liberty or property interest to trigger a requirement of due process. See *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). But injury to reputation can nonetheless suffice for purposes of constitutional standing. Thus, in *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), the Court found that a politician and film distributor had standing to challenge a government agency's stigmatizing as "political propaganda" foreign films that he wished to exhibit. The Court rested not only on affidavits indicating that this branding would affect his chances for reelection, *id.* at 473–74, 107 S.Ct. 1862, but also on the impact on his reputation generally, *id.* Here, the official characterization of an apparently upstanding federal judge as having "engaged for a number of years in a pattern of abusive behavior" that was " 'prejudicial to the effective and expedi-

tious administration of the business of the courts' " inflicts, we think, enough injury. Committee Report at 150–51 (quoting 28 U.S.C. § 372(c)).

At some point, however, claims of reputational injury can be too vague and unsubstantiated to preserve a case from mootness. See *Advanced Management Technology, Inc. v. FAA*, 211 F.3d 633, 636–37 (D.C.Cir.2000). Insofar as the one-year and three-year suspensions may have continuing reputational effects on top of the defendants' express reprimand, they are not enough. The legally relevant injury is only the incremental effect of a record of the suspensions (since the fact of the suspensions can no longer be remedied), over and above that caused by the Council's and the Conference's explicit condemnations. See *Friedman v. Shalala*, 46 F.3d 115, 117–18 (1st Cir.1995). And even as to that increment the most we could say at McBryde's behest is that in imposing and affirming the suspension sanction the Judicial Council and Review Committee performed acts reserved by the Constitution to the House and a two-thirds majority of the Senate. We cannot see how this would rehabilitate his reputation. Moreover, the Supreme Court has strongly suggested, without deciding, that where an effect on reputation is a *collateral* consequence of a challenged sanction, it is insufficient to support standing or, presumably, to escape mootness. See *Spencer v. Kemna*, 523 U.S. 1, 16–17 n. 8, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). In this circuit, when injury to reputation is alleged as a secondary effect of an otherwise moot action, we have required that "some tangible, concrete effect" remain, susceptible to judicial correction. See *Penthouse Int'l*,

3. See <http://www.ca5.uscourts.gov/>, last accessed on June 20, 2001.

*Ltd. v. Meese,* 939 F.2d 1011, 1019 (D.C.Cir.1991).

\* \* \* \* \* \*

■ Although the injury to Judge McBryde's reputation preserves the public reprimand from mootness and affords standing, yet another question remains about our jurisdiction. The statute enabling the Judicial Council and Review Committee to consider Judge McBryde's conduct sets out the avenues through which a judge may challenge actions taken against him. 28 U.S.C. § 372(c)(10). It allows a petition to the Judicial Conference for review of a decision of the judicial council taken under § 372(c)(6). It then appears to preclude alternative avenues of review:

> Except as expressly provided in this paragraph, all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise.

28 U.S.C. § 372(c)(10). Twice in the past this provision has appeared before us, but on neither occasion did we need to resolve its meaning. See *Hastings v. Judicial Conference of the United States,* 829 F.2d 91, 107 (D.C.Cir.1987) (*"Hastings II"*); *Hastings v. Judicial Conference of the United States,* 770 F.2d 1093, 1103 (D.C.Cir.1985) (*"Hastings I"*).

There are some claims that this section definitely does *not* preclude. The statutory language closely parallels that construed in *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), where Congress provided that "decisions" of the Veterans Administration "on any question of law or fact" under certain laws "shall be final and conclusive," and expressly withheld jurisdiction from any court to review "any such decision." *Id.* at 365 n. 5, 94 S.Ct. 1160 (quoting the then-applicable version of 38 U.S.C. § 211(a)).

The Court held that § 211(a) had no application to challenges to the constitutionality of the statutes in question, i.e., challenges to the decisions of Congress, not the Veterans Administration. See *id.* at 367, 94 S.Ct. 1160. This interpretation allowed the Court to avoid the " 'serious constitutional question' " that would be posed "if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (quoting *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)). Similarly, the wording of § 372(c)(10) does not withhold jurisdiction over Judge McBryde's claims that the *Act* unconstitutionally impairs judicial independence and violates separation of powers.

This leaves four claims in addition to the facial constitutional challenges. Two of these four also invoke the Constitution, challenging the actions of the defendants in applying the Act to Judge McBryde. The first claim is that the defendants inflicted their sanction without providing him due process. This claim principally involves an assertion that the whole project arose out of a conflict between himself and then-Chief Judge Politz, whose actions furthering the investigation Judge McBryde regards as "retaliation" and who, he claims, combined "investigative, charging, prosecutorial and adjudicative functions." Judge McBryde argues, in effect, that he was denied due process because Judge Politz refused to recuse himself. The second constitutional claim is somewhat obscure. He argues, in essence, that the *methods* used by the Judicial Council and Judicial Conference in imposing the sanction, were particularly invasive and therefore violated judicial independence. He cites two examples. When the Review Committee amended the Judicial Council's

order so as to permit reinstatement if the council found that Judge McBryde had "seized the opportunity for self-appraisal and deep reflection in good faith," Judicial Conference Report at 24, it engaged (he says) in forbidden "judicial behavior modification." And the Judicial Council's use of psychiatrists for advice on Judge McBryde's mental health, and on the possible causes of his conduct, was "fundamentally destructive of judicial independence."

Beyond these constitutional claims are two phrased by Judge McBryde as assertions that the actions of the Special Committee, the Council and the Review Committee against him were "Beyond the Agencies' Statutory Jurisdiction." One of these claims is in fact an attack on the defendants' procedures, namely an argument that although the investigative process was launched by complaints formally filed under § 372, it widened as it went on to encompass conduct not mentioned in those initial complaints. The other is a claim that the defendants were without statutory authority to investigate and penalize Judge McBryde "for" the merits of his decisions and rulings (his characterization of defendants' actions). We conclude that § 372(c)(10) bars all four challenges.

▮ As we said, two of the claims are framed in constitutional terms. When the Constitution is invoked, a claim of preclusion faces an especially high hurdle. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster,* 486 U.S. at 603, 108 S.Ct. 2047 (citing *Robison,* 415 U.S. at 373–74, 94 S.Ct. 1160). And a series of cases in this circuit have held that this special clarity is necessary even for as applied challenges. See *Griffith v. FLRA,* 842 F.2d 487, 494–95 (D.C.Cir.1988); *Ungar v. Smith,* 667 F.2d 188, 193 (D.C.Cir.1981); *Ralpho v. Bell,*

569 F.2d 607, 620–21 (D.C.Cir.1977). Under these cases, we find preclusion of review for both as applied and facial constitutional challenges only if the evidence of congressional intent to preclude is "clear and convincing." The preclusive language here is quite similar to that of 5 U.S.C. § 8128(b), which the Court singled out in *Lindahl v. OPM,* 470 U.S. 768, 779–80 & n. 13, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), as an "unambiguous and comprehensive" preclusion of review. See also *Czerkies v. Department of Labor,* 73 F.3d 1435, 1443 (7th Cir.1996) (Easterbrook, J., concurring). But see *id.* 73 F.3d at 1442 (majority opinion finding jurisdiction despite § 8128(b)); *Paluca v. Secretary of Labor,* 813 F.2d 524, 525 (1st Cir.1987) (same). But under this court's *Ralpho* trilogy, we have not regarded broad and seemingly comprehensive statutory language as supplying the necessary clarity to bar as applied constitutional claims. See *Griffith,* 842 F.2d at 490 (citing 5 U.S.C § 7123(a) (1982)); *Ungar,* 667 F.2d at 193 (citing 22 U.S.C. § 1631o(c) (1976)); *Ralpho,* 569 F.2d at 613 (citing § 2020 of the Micronesian Claims Act of 1971). In the absence of explicit statutory language barring review of constitutional challenges, the opinions studied the legislative history, finding the clear and convincing standard unsatisfied in all three cases. *Griffith,* 842 F.2d at 494–95; *Ungar,* 667 F.2d at 196; *Ralpho,* 569 F.2d at 621–22.

We pretermit the possibility that the Supreme Court's decision in *Traynor v. Turnage,* 485 U.S. 535, 542–45, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), postdating the last of the circuit trilogy (*Griffith*), has undermined the trilogy's premise. It may have done so by treating the *Robison* decision (source of the circuit trilogy) as deriving more from statutory language allowing review of attacks on the facial validity of the provision being applied (whether the

attack was statutory or constitutional), and less from ideas of special status for constitutional claims.

Assuming arguendo the full applicability of the circuit trilogy, however, we nonetheless find the requisite clarity of preclusive intent. Of course if the trilogy is read to require magic words expressly barring as applied constitutional attacks, they are not to be found. But the legislative history manifests express concern over the *Robison* issue and what appears to have been a deliberate congressional effort to assure that in practice ample review would occur. Congress vested the authority for implementing the Act exclusively in the hands of Article III judges, providing for initial action by one group of such judges and for review by another group. Having done so, Congress clearly meant to be understood quite literally when it said in § 372(c)(10) that orders of the Judicial Conference or relevant standing committee "shall not be judicially reviewable on appeal."

The Senate bill would have established a special Article III court for review of misconduct findings—coupled with preclusion of any other review. S. 1873, as reported out of committee and as passed by the Senate, provided for creation of a " 'court of record to be known as the Court on Judicial Conduct and Disability.' " See S. 1873, 96th Cong. § 2(a) (proposed 28 U.S.C. § 372(g)(1)) (as reported to the full Senate by the Judiciary Committee on October 10, 1979). " 'The Court may exercise all appropriate judicial powers incident or necessary to the jurisdiction conferred upon it.' " *Id.* The bill precluded further review of the Court's actions in language similar to that of the final version: " 'There shall be no judicial review of any order or action of the Court taken under this subsection or subsection (h).' " *Id.* (proposed 28 U.S.C § 278(i)(3)). In dis-

cussing the new Court, the Committee report said:

A national court of stature will help to alleviate the fear and public perception of a local "whitewash" of a citizen's complaint. It will also provide a forum for a judge who believes that the council of his circuit has acted against him in an unwarranted or unfair manner. In addition, by providing this court with broad discretionary power to regulate the number of cases it wishes to hear, the provision assures that a bureaucratic, excessively formalized procedure will be avoided.

S. Rep. No. 96–362, at 3 (1980), reprinted in 1980 U.S.C.A.A.N. 4315, 4317.

In the Senate debate, Senator DeConcini introduced a report commissioned by the Judiciary Committee's staff and prepared by Mr. Johnny H. Killian. The report directly addressed the *Robison* issue. After reviewing Supreme Court authority on whether *any* right of appeal was required, the report said:

The Supreme Court in dicta in recent cases has hinted that preclusion of judicial review of constitutional claims might raise constitutional questions, *Johnson v. Robison,* 41[5] U.S. 361, 366–67, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Weinberger v. Salfi,* 422 U.S. 749, 761–762, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), but· its concern appears to be that litigants at some point have access to an Article III court, *Territory of Guam v. Olsen,* 431 U.S. 195, 201–202, 204, 97 S.Ct. 1774, 52 L.Ed.2d 250 (1977), and the Court on Judicial Conduct and Disability would be an Article III court.

125 Cong. Rec. 30,050/1 (Oct. 30, 1979) (remarks of Sen. DeConcini).

The House version called instead for review by the Judicial Conference. When it was returned to the Senate, Senator

DeConcini expressed regret that the "Court" envisaged by the Senate bill had not survived. But he recognized the close similarity between review by that "Court" and by the Judicial Conference (or a standing committee thereof):

> Today's compromise substitute amendment is at least close to what was originally envisioned by the Senate this Congress, in that a permanent, independent standing committee of the judicial conference is authorized to be established. Such a body, while not an independent review court, will provide for uniformity of decisions and the building of precedents.

126 Cong. Rec. 28,090/2 (Sept. 30, 1980) (remarks of Sen. DeConcini).

Indeed, it is not clear whether there is any material difference between the two. In both cases, of course, the persons conducting the review are exclusively Article III judges. In both cases review is discretionary. 126 Cong. Rec. 28,092/3 (Sept. 30, 1980). Speaking of the Judicial Conference review, Senator DeConcini observed: "It is envisioned that over the long term these petitions will develop into something like petitions for writs of certiorari to the Supreme Court of the United States." *Id.*

It seems fair to suppose that both houses of Congress realistically expected that the Judicial Conference would hear all *serious* claims. Indeed, explaining its rejection of the Senate proposal for a new court, the House Judiciary Committee only expressed concern that its formal character would unduly invite complaints *against* judges and thereby threaten judicial independence:

> In essence, the Committee rejected the special court feature of S. 1873 and certain other of its features because cre-

ation of a system in which complaints against federal judges could be so easily pressed to a formal adversary accusatorial proceeding raised the dangers of a substantial chilling effect on judicial independence, as well as the danger of infliction of harm and disruption of the administration of justice.

H.R. Rep. No. 96–1313, at 18 (1979). The only discussion of the matter on the floor was the observation that "[t]here is also an appellate procedure which culminates in the Judicial Conference of the United States." 126 Cong. Rec. 25,370/3 (Sept. 15, 1980) (remarks of Rep. Gudger). Thus the House's expectations for review appear to be entirely consistent with those of the Senate. Only the means for providing the review were altered, and the shift seems to be due to a greater, not lesser, solicitude for judges' constitutional rights and interests.

Later developments seem to suggest that the risks the compromise sought to constrain were indeed substantial. According to the Administrative Office of the U.S. Courts, the year ending September 30, 2000 saw 696 complaints filed under § 372(c). During the same period, 715 complaints were concluded. Chief judges dismissed 359 complaints and judicial councils dismissed 354 more. Only two resulted in public censure and 162 remain pending.[4] Defending against these claims is disruptive and potentially expensive. See App. Br. at 52. Congress sought in the Act to give the judiciary the power to "keep its own house in order" by conducting its own investigations of misconduct. See S.Rep. No. 96–362, at 11, *reprinted in* 1980 U.S.C.A.A.N. at 4325. By adding review preclusion, they limited the poten-

---

4. See *2000 Report of the Director,* Table S–22, Report of Complaints Filed and Action Taken Under Authority of Title 28 U.S.C. Section 372(c) available online at <http://www.uscourts.gov/judbus2000/tables/s22sep00.pdf>, last accessed on June 20, 2001.

tial disruption, while providing for adequate review in those few cases that might require it.

▬▬▬ We note that the Judicial Conference committee has disclaimed authority to rule on as applied, as well as facial, constitutional challenges:

> We have no competence to adjudicate the facial constitutionality of the statute or its constitutional application to the speech of an accused judge, however inappropriate or offensive his words may be. We are not a court. Our decisions are not subject to review by the Supreme Court of the United States. We sit in review of the action of the Circuit Council. The courts of the United States are open for the adjudication of such questions.

Judicial Conference Report at 21, quoting its decision in No. 84-372-001. The committee offered no reason for this position. While we apply deference under *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to agencies' jurisdictional decisions, see *Transmission Access Policy Study Group v. F.E.R.C.,* 225 F.3d 667, 694 (D.C.Cir.2000); *Oklahoma Natural Gas v. FERC,* 28 F.3d 1281, 1283-84 (D.C.Cir.1994), the statutory mandate to the committee appears to contain no language justifying a decision to disregard claims that a circuit judicial council has violated a judge's constitutional rights in application of the Act. See § 372(c)(10) (authorizing "review" by the Judicial Conference or a standing committee thereof). To be sure, agencies ordinarily lack jurisdiction to " 'adjudicat[e] ... the constitutionality of congressional enactments,' " *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 215, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (quoting *Robison,* 415 U.S. at 368, 94 S.Ct. 1160), "although the rule is not mandatory," *id.* But agencies do have "an obligation to address properly presented constitutional claims which ... do not challenge agency actions mandated by Congress." *Graceba Total Communications, Inc. v. F.C.C.,* 115 F.3d 1038, 1042 (D.C.Cir.1997). See also *Meredith Corp. v. F.C.C.,* 809 F.2d 863, 872-74 (D.C.Cir. 1987). We can see neither any reason why Congress would have withdrawn that power and obligation from a reviewing "agency" composed exclusively of Article III judges nor any indication that it has done so.

Thus Congress in the end enabled a sanctioned judge to seek review by Article III judges of the Judicial Conference of all claims except (presumably) facial attacks on the statute. As a result, to read § 372(c)(10) to allow review of constitutional as-applied claims by conventional courts *as well* would generate substantial redundancy, an implausible legislative purpose. Moreover, whereas the legislative history of the statutes at issue in *Griffith* and *Ungar* reflected a "silent" or unexplained deletion of an exception for constitutional claims, see Dissent at 9-10, here Congress explained the deletion of the Senate's formal Article III court. The less formal version, the House Judiciary Committee thought, would be more protective of sanctioned judges, because the Senate solution risked generation of "formal adversary accusatorial proceeding[s]" that would "raise[ ] the dangers of a substantial chilling effect on judicial independence." H.R. REP. No. 96-1313, at 18 (1979). Although the difference in fact seems to us largely cosmetic, the House-induced change seems entirely consistent with the Senate's plan that review should cease once a single Article III panel, drawn from the Judicial Conference, had passed on the work of the sanctioning circuit.

In short, we find the evidence clear and convincing that Congress intended § 372(c)(10) to preclude review in the

courts for as applied constitutional claims. Members of Congress were aware of *Robison* and more generally of doctrines presuming access to Article III review of decisions impinging on important interests. Put ultimately to a choice between review by an Article III "Court" and review by a committee of Article III judges chosen by and from the Judicial Conference, they chose the latter. They did so in order to protect judges from the "chilling" effects of unnecessary complaints, not with any expectation that the Judicial Conference would scant judges' rights.

Vesting the power to review facial attacks on the Act in the courts conforms fully to *Robison*; but reserving to the Judicial Conference committee *exclusive* authority over as applied constitutional challenges fulfills both the presumption in favor of access to Article III review of constitutional claims and the norm requiring "agencies" to avoid unconstitutional applications not mandated by Congress, at the same time as it prevents undue prolongation of the disciplinary process. Accordingly, we find that in § 372(c)(10) Congress clearly and convincingly barred our review of Judge McBryde's claim of unconstitutional application of the Act.

We are left only with the two claims that defendants exceeded their statutory authority—the objections that the investigation impermissibly swelled beyond the scope of the initial complaints and that the Judicial Council sanctioned Judge McBryde for the merits of his decisions. Judge McBryde seeks an exception to the jurisdictional limitation for these claims under *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). But *Kyne* involved preclusion that had been *inferred* from the National Labor Relations Act, and is therefore merely an application of the familiar requirement that there be

"clear and convincing evidence" of legislative intent to preclude review. See *Board of Governors v. MCorp Financial, Inc.,* 502 U.S. 32, 44, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (internal citations omitted). Judge McBryde also seeks an exception allowing review under *Dart v. United States,* 848 F.2d 217 (D.C.Cir.1988), where this court reviewed an agency action despite an explicit preclusion provision. But *Dart* stands for the exceedingly narrow proposition that a statute precluding review is limited by its language. "[T]he Veterans' Administrator cannot issue oil drilling permits—nor can the Secretary of Labor rescind television licenses—and expect to escape judicial review by hiding behind a finality clause." *Id.* at 224. Thus, in *Dart* itself we found that the Secretary of Commerce's order *reversing* an administrative law judge's decision did not enjoy the preclusion that the statute afforded an order to "affirm, modify or vacate" the ALJ's decision. See *id.* at 227–31. But *Dart* cannot mean that statutory insulation of a specific type of "order" from review is automatically ineffective whenever the complainant asserts legal error. And that is the most Judge McBryde claims here.

His complaint expansion theory is that the actions taken against him were not based on the merits of any properly filed or identified complaint, as provided for by 28 U.S.C. § 372(c)(1). Subparagraph (c)(4)(A) gives the chief judge the power to form a special committee "to investigate the facts and allegations contained in the complaint." Absent a complaint, we may assume, the Judicial Council could not make a valid order under paragraph (c)(6). Accordingly, Judge McBryde argues that Circuit Rule 9(A), which allows a special committee to expand the scope of an investigation, is invalid; on that account, he claims, we do not have before us an "order" of the sort for which judicial review is

barred by § 372(c)(10). But § 372(c)(5) explicitly gives a special committee the authority to "conduct an investigation as extensive as it considers necessary," and § 372(c)(1) states that a valid written complaint may be made by "any person." 28 U.S.C. §§ 372(c)(1) & (5). Thus Judge McBryde's objection reduces to arguments as to the exact reach of these provisions. Treating such a claim as involving a deficiency that would strip the defendants' acts of the character of "orders" for purposes of § 372(c)(10) would obliterate the section altogether.

Judge McBryde's statutory merits-relatedness claim also falls short. The Act itself is permissive when it comes to the investigation of claims that are related to the merits. The chief judge, under § 372(c)(3) "*may*" dismiss a complaint if he finds the complaint is "directly related to the merits of a decision or a procedural ruling." A finding of merits relation does not *prohibit* the chief judge from appointing a special committee and therefore does not undermine the validity of the action of the Special Committee or the Judicial Council for the purposes of § 372(c)(10). Had the Fifth Circuit Judicial Conference promulgated a rule specifically calling for the investigation of the merits of decisions, such a rule might conceivably be challenged under *Traynor*, 485 U.S. at 541–45, 108 S.Ct. 1372 (allowing review of claim that an agency regulation was invalidated by a statute not committed to that agency's exclusive administration). But no such rule exists in this case, and Judge McBryde has stated his objection only in the most general terms. Nowhere does he suggest that the Judicial Council's action has the character of a rule, or suggest an exception under *Traynor*, or even suggest which statutory provision such a rule would run afoul of. Again, it is plain that the statutory error asserted (if error it be) is not the sort that under *Dart* would

deprive the defendants' orders of the status of "orders and determinations" covered by § 372(c)(10), or otherwise escape its preclusive effect.

\* \* \* \* \* \*

Judge McBryde makes two related facial constitutional challenges that survive both mootness and preclusion. First, he reads the clause vesting the impeachment power in Congress as precluding *all* other methods of disciplining judges; on this theory, the Act violates separation of powers doctrine. Second, he says that the principle of judicial independence implicit in Article III bars discipline of judges for actions *in any way* connected to his actions while on the bench.

The issues are of course linked, as the great bulwarks of judicial independence are the guarantees of life tenure and undiminished salary during good behavior. For Judge McBryde, the fact that individual judges are the direct beneficiaries of these guarantees proves that it is the individual judge that is the relevant unit of judicial independence. While this perspective has had its supporters, see *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 129–43, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Douglas, J., and Black, J., dissenting); *Hastings I*, 770 F.2d at 1106–07 (Edwards, J., concurring); but see Harry T. Edwards, *Regulating Judicial Misconduct and Divining "Good Behavior" for Federal Judges*, 87 MICH. L.REV. 765, 785 (1989), the cases speak almost exclusively to judicial independence from the influence or control of the legislative and executive branches. See *Mistretta v. United States*, 488 U.S. 361, 382, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("the Framers 'built into the tripartite Federal Government ... a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the

other.'") (quoting *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)); *United States v. Will,* 449 U.S. 200, 217–18, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) ("[a] Judiciary free from control by the Executive and Legislature"); THE FEDERALIST No. 78 (Hamilton). After all, "Article III creates[ ] not a batch of unconnected courts, but a judicial *department* composed of 'inferior Courts' and 'one supreme Court.'" *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 227, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (emphasis in original).

■ That individual judges are direct beneficiaries of the tenure and salary protections of Article III by itself hardly shows that the overarching purpose of these provisions was to insulate individual judges against the world as a whole (including the judicial branch itself), rather than, as the cases above indicate, to safeguard the branch's independence from its two competitors. For support of his view Judge McBryde points to a footnote from *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which the Court said that the two guarantees "serve other institutional values as well," among them "insulat[ing] the individual judge from improper influences not only by other branches but by colleagues as well." *Id.* at 59 n. 10, 102 S.Ct. 2858. But the primary value the Court asserted was "to ensure the independence of the Judiciary from the control of the Executive and Legislative Branches of government." *Northern Pipeline,* 458 U.S. at 59, 102 S.Ct. 2858. The conclusion that other values are also in play is a far cry from Judge McBryde's argument that the individual judge must be constitutionally sheltered not merely from removal and salary diminution but also from lesser sanctions of

every sort. Lesser sanction are common, as the Court has noted:

> Many courts ... have informal, unpublished rules which ... provide that when a judge has a given number of cases under submission, he will not be assigned more cases until opinions and orders issue on his 'backlog.' These are reasonable, proper, and necessary rules, and the need for enforcement cannot reasonably be doubted.

*Chandler,* 398 U.S. at 85, 90 S.Ct. 1648. As there is no basis for Judge McBryde's core assumption that judicial independence requires absolute freedom from such lesser sanctions, his two claims fall swiftly.

■ Judge McBryde frames his separation of powers claim as whether the Constitution "allocates the power to discipline federal judges and, if so, to which branches of government." App. Br. at 54. Finding that it allocates the power to Congress in the form of impeachment, he concludes that it excludes all other forms of discipline. But Judge McBryde's attempt to fudge the distinction between impeachment and discipline doesn't work. The Constitution limits judgments for impeachment to removal from office and disqualification to hold office. U.S. Const. art. I, § 3, cl. 7. It makes no mention of discipline generally. The Supreme Court recently observed that it accepted the proposition that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen v. Harris County,* 529 U.S. 576, 583, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (internal citations omitted). But application of the maxim depends on the "thing to be done." Here the thing to be done by impeachment is removal and disqualification, not "discipline" of any sort.

The Constitution itself preserves criminal prosecution, see U.S. Const. art. I, § 3, cl. 7 ("the Party convicted shall neverthe-

less be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law"), and at least three circuits have held that prosecution of judges can precede impeachment. See *United States v. Claiborne,* 727 F.2d 842, 845 (9th Cir. 1984); *United States v. Hastings,* 681 F.2d 706, 710 (11th Cir.1982); *United States v. Isaacs,* 493 F.2d 1124, 1140–44 (7th Cir. 1974). Even Justices Douglas and Black, who dissented in *Chandler* from the Court's narrowly framed denial of relief for a district judge whose colleagues had limited his case assignments, acknowledged that judges were subject to criminal prosecution. See *Chandler,* 398 U.S. at 140, 90 S.Ct. 1648 ("If they break a law, they can be prosecuted. If they become corrupt or sit in cases in which they have a personal or family stake, they can be impeached by Congress.") (Douglas, J., dissenting); *id.* at 141–42, 90 S.Ct. 1648 ("[J]udges, like other people, can be tried, convicted, and punished for crimes.") (Black, J., dissenting).

Judge McBryde accepts that judges are subject to prosecution, but argues that impeachment nonetheless excludes discipline of judges *by* judges. In yet another attempt to prove his individualized idea of judicial independence, he points to Hamilton's statement in Federalist No. 79 that: "The precautions for [judges'] responsibility are comprised in the article respecting impeachments.... This is the only provision on the point, which is consistent with the necessary independence of the judicial character, and is the *only* one which we find in our own Constitution in respect to our own judges." THE FEDERALIST No. 79 at 532–33 (Hamilton) (Jacob E. Cooke, ed., 1961) (emphasis added). But even if we assume the remark embraces not merely removal and disqualification but lesser forms of discipline, it does not seem likely to have been aimed at intra-branch constraints. Hamilton's concern with judicial

independence seems largely to have been directed at the threat from the two other branches. "I agree that 'there is no liberty, if the power of judging be not separated from the legislative and executive powers.'" THE FEDERALIST No. 78 at 523 (Hamilton) (Jacob E. Cooke, ed.) (quoting Montesquieu). And he famously characterized the judiciary as "the least dangerous" branch. *Id.* at 522. Thus it seems natural to read Hamilton as seeing the guarantees of life tenure and undiminished compensation, and the limited means for denying a judge their protection, simply as assuring independence for the judiciary from the other branches. The Supreme Court has considered the same passage as Judge McBryde invokes and so interpreted it: "In our constitutional system, impeachment was designed to be the *only* check on the Judicial branch *by the Legislature.*" *Nixon v. United States,* 506 U.S. 224, 235, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (some emphasis added).

Indeed, the Hamiltonian concern for protecting the judiciary from other branches argues *for* internal disciplinary powers. Arrogance and bullying by individual judges expose the judicial branch to the citizens' justifiable contempt. The judiciary can only gain from being able to limit the occasions for such contempt. See *In re Certain Complaints Under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit,* 783 F.2d 1488, 1507–08 (11th Cir. 1986)

Judge McBryde invokes another element of constitutional history—the framers' consideration and rejection of the proposal to vest the impeachment power in the courts, or in some combination of judicial and legislative officers. But, as was true of the effort to find a negative implication in the Constitution itself, this tells us only what we already knew: that the

framers lodged the powers of removal and disqualification solely in Congress, in the form of impeachment.

Judge McBryde acknowledges, as he must, that in other contexts the impeachment power does not exclude all intra-branch discipline. In *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the Supreme Court found (in the strongest form—against a contrary decision by Congress) that the President had power to *remove* civil officers, excluding judges, even though Congress would have been able to remove some of the same officers only through impeachment. While that power is not absolute, its limitation does not depend on the exclusive power of Congress to impeach. See *Morrison v. Olson*, 487 U.S. 654, 691, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988)

Judge McBryde would have us write off the Court's endorsement of executive branch discipline as peculiar to and dependent on the executive's hierarchical structure. But the question is the implication from the Constitution's vesting of impeachment power in Congress. The Constitution makes no distinction between judges and other officers. It provides only that "all civil Officers of the United States, shall be removed from Office on Impeachment." U.S. Const. art. II, § 4.

In short, the claim of implied negation from the impeachment power works well for removal or disqualification. But it works not at all for the reprimand sanction, which bears no resemblance to removal or disqualification and is the only sanction in the case that remains unmoot.[5] Thus Judge McBryde's textual argument fails. Given the benefits to the judiciary from intra-branch efforts to control the self–indulgence of individual judges, we see no basis for inferring structural limits on Congress's enabling such efforts.

▮ Judge McBryde's second facial claim is that the Constitution, even assuming it does not altogether bar intra-judicial sanctions (other than by appeal, mandamus, etc.), flatly bars any such sanction for "anything to do with anything that happened when the judge ... was acting and deciding cases or in any phase of the decisional function." Oral Arg. Tr. at 17–18. His counsel was quite explicit that this would include a judge's nakedly racist disparagement of counsel, *id.* at 9, indeed, "anything that the judge does verbally or physically in the course of adjudication," *id.* at 8. Asked whether this would include punching counsel, Judge McBryde's counsel suggested that criminal proceedings at state law would supply an ample remedy. *Id.* at 9.

It may help put Judge McBryde's theory in perspective to look at one of the many episodes that led to the present sanctions. In 1992, Judge McBryde sanctioned a lawyer appearing before him for failing to have her client attend a settlement conference in violation of Judge McBryde's standard pretrial order, which required all principals to attend the conferences. Counsel represented a corporation and its employee, defendants in a suit in which plaintiffs, a woman and her 10–year old daughter, had alleged sexual harassment. One of the allegations was that the individual defendant "had terrorized the 10–year old ... by popping out his glass eye and putting it in his mouth in front of her." *Committee Report* at 19. The lawyer thought the presence of the individual defendant would be counter-productive to settlement efforts; the individual had no assets and had given her full authority to settle. See *id.* at 20.

---

**5.** Obviously, we do not decide whether a long-term disqualification from cases could, by its practical effect, affect an unconstitutional "removal."

After chastising the lawyer, Judge McBryde required that she attend a reading comprehension course and submit an affidavit swearing to her compliance. See *id.* at 20. The attorney submitted an affidavit attesting to the fact that she found a course and attended for three hours a week for five weeks. Judge McBryde challenged her veracity and required that she submit a supplemental affidavit "listing 'each day that she was in personal attendance at a reading comprehension course in compliance with [the] court's order; the place where she was in attendance on each date; the course title of each course; how long she was in attendance on each day; and the name of a person who can verify her attendance for each day listed.'" *Id.* at 22. She complied. The Special Committee characterized this incident as reflecting a "gross abuse of power and a complete lack of empathy." *Id.* at 18. Judge McBryde tells us that the defendants unconstitutionally impugn judicial independence when they express a formal, institutional condemnation of this sort.

We assume arguendo that the procedures of the Act may not constitutionally be used as a substitute for appeal. But Judge McBryde's theory plainly goes well beyond judicial acts realistically susceptible of correction through the avenues of appeal, mandamus, etc. Appeal is a most improbable avenue of redress for someone like the hapless counsel bludgeoned into taking reading comprehension courses and into filing demeaning affidavits, all completely marginal to the case on which she was working. Possibly she could have secured review by defying his orders, risking contempt and prison. But we are all at a loss to see why those should be the only remedies, why the Constitution, in the name of "judicial independence," can be seen as condemning the judiciary to silence in the face of such conduct. Counsel punched out by the judge could not even

pursue a remedy by risking contempt, of course, since the punch involves no judicial order that he could disobey.

The Court said in *Chandler*, in dictum to be sure:

> There can, of course, be no disagreement among us as to the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function. But it is quite another matter to say that each judge in a complex system shall be the absolute ruler of his manner of conducting judicial business.

398 U.S. at 84, 90 S.Ct. 1648. As we noted above, we see nothing in the Constitution requiring us to view the individual Article III judge as an absolute monarch, restrained only by the risk of appeal, mandamus and like writs, the criminal law, or impeachment itself. We thus reject Judge McBryde's facial constitutional claims.

\*　　\*　　\*　　\*　　\*　　\*

The process of construing § 372(c)(10) led us to raise and answer the question whether the Review Committee was authorized to entertain Judge McBryde's constitutional as applied challenges, and we concluded that it was. The Committee, as we noted, has given a contrary answer. As we read § 372(c)(10) to deny us the authority to review any aspect of the decisions about Judge McBryde other than the facial constitutional claims, we have no authority to mandate the Committee's consideration of the as applied claims. We believe, nonetheless, that the Review Committee should reconsider its view in light of our opinion and we therefore request it to do so.

\*　　\*　　\*　　\*　　\*　　\*

Accordingly, the judgment of the district court as to the one-year and three-year

suspensions is *vacated* and the judgment as to the reprimand is *affirmed*.

*So ordered.*

TATEL, Circuit Judge, concurring in part and dissenting in part:

I agree with the court in many respects: that Judge McBryde's challenge to the reprimand is not moot; that the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 is not facially unconstitutional; and that the Act bars us from reviewing Judge McBryde's statutory claims. I do not agree, however, that the Act precludes us from reviewing Judge McBryde's as-applied constitutional claims. I would therefore have reached those claims and, because I think one claim has merit, reversed the district court and directed that the matter be remanded to the Fifth Circuit Judicial Council for further proceedings. Although the Council's Report finds that Judge McBryde engaged in some clearly egregious and sanctionable conduct, the Report also describes judicial conduct that was either less clearly abusive or apparently quite appropriate, and the Report never adequately explains how—or even in some instances whether—such behavior rises to the level of a clear abuse of judicial power. The Report thus leaves open the possibility that Judge McBryde was sanctioned in part for behavior that was not at all abusive. In addition, because the Report is imprecise and leaves much conduct unexplained, using the Report as a basis for sanctions risks chilling other district judges' ability to manage their courtrooms effectively. I thus believe that the Council's actions amounted to an unconstitutional infringement of judicial independence.

I

This case has its origins in a prior dispute between Judge McBryde and his colleagues over certain case assignments. In late April and early May of 1995, Chief Judge Buchmeyer of the Northern District of Texas reassigned two cases, *United States v. Satz*, No. 4:94–CR–094–R (N.D. Tex.) and *Torres v. Trinity Industries, Inc.*, No. CA4–90–812–A (N.D. Tex.), from Judge McBryde to himself. The reassignments responded to Judge McBryde's allegedly "unwarranted" and "abusive" treatment of attorneys and court personnel. *See In re John H. McBryde*, 117 F.3d 208, 215–18 (5th Cir.1997). In *Satz*, Judge McBryde had found an Assistant United States Attorney in contempt of court for, among other things, stating that a sealing order in a related federal case prevented her from answering certain of Judge McBryde's questions. Judge McBryde believed, erroneously as it turned out, that no such order existed. *Id.* at 213. *Torres* involved correspondence between Judge McBryde and the clerk of the court over an administrative error that had resulted in a court–approved settlement not being implemented. Judge McBryde wrote that a letter from the clerk had been "so unprofessional and so disrespectful ... that it borders on, if it does not constitute, contempt of court." *Id.* at 215.

After Chief Judge Buchmeyer reassigned the two cases, Judge McBryde filed a Request for Assistance with the Fifth Circuit Judicial Council. *Id.* at 217. Fifth Circuit Chief Judge Politz referred the matter to a Special Investigatory Committee composed of himself, two fellow circuit judges, and two district judges. *Id.* Following several days of hearings, the Special Committee, relying on section 332 of the Act, upheld the reassignment, finding that "Judge McBryde's conduct in both cases was unwarranted." *Id.* Judge McBryde's attack on the AUSA and a second government official involved in *Satz* "and his accusations against them of lying

and contempt of court," the Committee concluded, "were baseless, threatening irreparable damage to [their] professional reputations and careers." *Id.* His attack on the clerk of the court was likewise "unwarranted [and] abusive, and threatened to damage [her] professional reputation." *Id.*

Almost two years later, the Fifth Circuit vacated the reassignment order. According to the court, the Council had no authority "to censure a judge under [section] 332" of the Act or to "order a case reassigned based on its disagreement with the district judge's factual findings." *McBryde*, 117 F.3d at 229. In reaching its conclusion, the court noted that "finders of fact could reasonably defend either side" of the dispute, stating explicitly that Judge McBryde "could piece together a number of facts that pointed to the larger conclusion that [the AUSA involved in the *Satz* case] was lying," that the Judge "delivered a cogent statement of his reasons for rejecting [the AUSA's] reliance on a broad sealing order," that "[w]e need not attribute paranoia or irrationality to Judge McBryde to explain his view that [the AUSA's] contentions about the sealing order were untruthful," and that "Judge McBryde's understanding of the factual basis for suspecting that [the court clerk in *Torres*] was on the verge of contempt was similarly within the bounds of reason." *Id.* at 218–19.

Meanwhile, shortly after Judge McBryde had requested the Judicial Council's assistance and long before the Fifth Circuit vacated the Special Committee's reassignment decision, Chief Judge Politz referred two complaints of misconduct against Judge McBryde (one of which involved the Judge's conduct in *Satz*) to the Special Committee, with directions to investigate and report on them. *Report of the Special Committee of the Fifth Circuit Judicial Council Regarding Complaints Against, and the Investigation into the Conduct of, Judge John H. McBryde* at 1 (Dec. 4, 1997). According to the Committee's eventual Report, Committee members were from the outset "concerned about two things: first, that Judge McBryde [might] have a health problem (physical or mental) which affect[ed] his activities as a judge, and second, that Judge McBryde ha[d] engaged in a pattern of abusive behavior as a federal judge." *Id.* at 3.

Pursuing its suspicions that Judge McBryde might suffer from a psychiatric disorder, the Committee submitted certain materials concerning Judge McBryde to two psychiatrists, asking the doctors whether a psychiatric examination of the Judge was warranted. Report at 3. When both doctors answered yes, the Council engaged in a series of ultimately unsuccessful efforts to get Judge McBryde to undergo such an examination. *Id.* In the meantime, the Special Committee learned about "more and more instances of allegations of repetitive, abusive and excessive conduct by Judge McBryde beyond the allegations in the ... complaints." *Id.* at 8. Therefore, invoking section 372(c)(5) of the statute, the Special Committee "decided to broaden its investigation" to encompass incidents from throughout Judge McBryde's judicial career. *Id.* In August, September, and October of 1997, the Committee held nine days of evidentiary hearings in New Orleans and Fort Worth. *Id.* at 9. Fifty-five witnesses testified, including federal district court judges, a state court judge, government and private attorneys who had practiced before or had contact with Judge McBryde, court personnel, former jurors who had served in Judge McBryde's courtroom, and current and former members of the Judge's staff. *Id.* at 9–10.

Based on this evidence, the Committee prepared a Report, the bulk of which set forth details concerning twenty-two separate incidents involving Judge McBryde's dealings with lawyers, fellow judges, a state judge, and the clerk of the court. Report at 10–107. Although these include some obviously abusive and serious incidents, *see, e.g.*, Maj. Op. at 67–68, the Report also includes several incidents that appear to be relatively trivial examples of a judge controlling a trial or of friction among judicial colleagues. For example, the Report describes an incident in which Judge McBryde, responding to defense counsel's claim that a prosecutor should have disclosed certain financial schedules, accused the prosecutor of adopting "a sort of cat-and-mouse approach to discovery." Report at 50. The judge neither dwelled on the matter nor imposed sanctions. *Id.* In another incident (that occurred in a parking lot), Judge McBryde became angry and lashed out at a fellow judge who had joked about the Judge's impatience. *Id.* at 101–03. On still another occasion (at a judges' meeting), Judge McBryde called two fellow judges "despicable." *Id.* at 103–04. Similar incidents appear throughout the Report: Judge McBryde was "not always solicitous of his fellow judges' needs or feelings" with respect to use of courtrooms, *id.* at 106; on learning that the lead public defender on a case was engaged in another courtroom, Judge McBryde attempted to proceed with the case "[r]ather than calling another matter on the docket," *id.* at 24; in a private, one-on-one meeting with the Federal Public Defender, Judge McBryde stated that he was "concerned" about the relationship between public defenders and U.S. Attorneys, indicating that he "suspected" that defenders and U.S. Attorneys were engaged in a " 'collusive effort' to subvert the Sentencing Guidelines," *id.* at 42.

The Report describes other conduct that, though apparently more abusive, might nonetheless be entirely appropriate under certain circumstances. For example, the Report recounts several instances in which Judge McBryde accused attorneys of bad faith, sometimes sanctioning them and sometimes not. *See, e.g.*, Report at 10–15, 15–18, 36–42. The Report also mentions two occasions on which Judge McBryde criticized an entire office. *See id.* at 17–18 ("I have perceived on more than one occasion recently that members of the Federal Public Defender's Office are less than candid with the court."); *id.* at 38 ("I just have the feeling that the Civil Section of the U.S. Attorney's office here in Fort Worth is not always candid with the Court. . . .").

The Report also examines Judge McBryde's trial rules and enforcement techniques. According to the Report, the Judge uses strict trial rules, including "the requirement that parties enter into . . . stipulation[s] with respect to . . . every uncontested fact in [a] case," which are then "read seriatim to the jury at the beginning of the case and may not be referred to again later in the proceeding," and a "prohibition on asking questions on cross-examination similar to questions asked of [witnesses] on direct examination." Report at 107–08. Quoting from transcripts in two cases, the Report states that "Judge McBryde's manner of enforcing his rules is harsh and often humiliating." *Id.* at 110. The Report describes the testimony of several witnesses who stated that the combination of Judge McBryde's rules and his manner of enforcing them creates an "oppressive and intimidating atmosphere that pervades Judge McBryde's courtroom," *id.* at 116, and has a "chilling effect" on these lawyers' ability to present their cases effectively, *id.* at 121. This kind of enforcement, the Report says, formed a "pattern" that had not

changed despite appellate criticism. *Id.* at 122. Because of the chilling effect of Judge McBryde's rules and his manner of enforcement, the Report concludes that attorneys, fearing humiliation or embarrassment, forego actions they believe are in their clients' best interests and fail to preserve issues for appeal. These problems, the Report notes, are difficult to correct through the appellate process. *Id.* at 121–22.

The Report acknowledges that some of Judge McBryde's former staff testified that he was "cordial and considerate in his dealings with them," and that several lawyers who testified on the Judge's behalf stated that he "prepares thoroughly, addresses motions promptly, . . . writes scholarly opinions on difficult legal questions," and moves cases through his docket expeditiously. Report at 123–24. Although acknowledging that these witnesses were comfortable practicing in front of Judge McBryde and thought that he was fair, *id.* at 113–15, the Committee concluded that just because "it is possible for some attorneys . . . to adapt to Judge McBryde's rules is not a vindication of these rules. The weight of evidence presented during the hearings convinces the Committee that Judge McBryde imposes unduly stringent rules on advocates and enforces these rules in an often harsh manner." *Id.* at 115–16.

Based on all of this evidence, the Report concludes (1) that "many of these individual instances, together with the patterns demonstrated over the years surveyed," indicate that Judge McBryde had "engaged in conduct prejudicial to the effective administration of the business of the courts," and (2) that Judge McBryde's "pattern of abusive behavior . . . has brought disrepute upon the federal judiciary." Report at 150. The Report recommends that the Council ask Judge McBryde to resign, and if he refused, that it impose the three sanctions—a reprimand and two suspensions—described in the court's opinion. Maj. Op. at 54–55. The recommended reprimand states that Judge McBryde's "intemperate, abusive and intimidating treatment of lawyers, fellow judges, and others ha[d] detrimentally affected the effective administration of justice . . . in the Northern District of Texas," and that Judge McBryde had "abused judicial power, imposed unwarranted sanctions on lawyers, and repeatedly and unjustifiably attacked individual lawyers and groups of lawyers and court personnel," thus having a "negative and chilling impact on the Fort Worth legal community," among other things "preventing lawyers and parties from conducting judicial proceedings in a manner consistent with the norms and aspirations of our system" and "harm[ing] the reputation of the court." Report at 154.

Invoking section 372(c)(6) of the Act, the Council imposed the three recommended sanctions. Six of the nineteen Council members voted against imposing the one-year suspension; two voted against the public reprimand; one voted against the three-year recusal. Order of the Judicial Council of the Fifth Circuit at 1, *In re John H. McBryde* (Jan. 7, 1998) (No. 95–05–372–0023).

Pursuant to the Act, Judge McBryde petitioned the Review Committee of the Judicial Conference for review of the Council's order. Granting "substantial deference" to the Judicial Council's findings of fact, Memorandum and Order of the Judicial Conference of the United States at 6, *In re Complaints of Judicial Misconduct or Disability* (Sept. 18, 1998) (No. 98–372–001), and expressly declining to review any of Judge McBryde's constitutional claims, *id.* at 21, the Review Committee rejected the Judge's remaining

procedural and substantive complaints. Finding the one-year suspension justified as a remedial, rather than a punitive, measure, the Review Committee revised the Council's sanction in one respect: it ordered the suspension terminated if Judge McBryde demonstrates that he had "seized the opportunity for self-appraisal and deep reflection in good faith and ... made substantial progress toward improving his conduct." *Id.* at 27.

## II

My main disagreement with the court centers on section 372(c)(10)'s last sentence—the Act's review preclusion clause. Unlike my colleagues, I do not believe that this clause prevents us from reaching Judge McBryde's as-applied constitutional claims.

As the court points out, under both Supreme Court and D.C. Circuit precedent, we construe review preclusion clauses to prevent review of constitutional claims only when we find "clear and convincing" evidence of congressional intent to do so. Maj. Op. at 59. Even outside the constitutional context, a "general presumption favor[s] judicial review in the absence of 'clear and convincing evidence of a contrary legislative intent.'" *Griffith v. Fed. Labor Relations Auth.,* 842 F.2d 487, 490 (D.C.Cir.1988) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). "The maxim that congressional preclusion of judicial review must be 'clear and convincing' applies in a particularly rigorous fashion ... when constitutional claims are at stake." *Id.* at 494. As we said in *Ungar v. Smith,* "[w]hen ... [a] plaintiff seeks to invoke the aid of the judicial branch on constitutional grounds, the Supreme Court and this court have both indicated that only the clearest evocation of congressional intent to proscribe judicial review of constitution-

al claims will suffice to overcome the presumption that the Congress would not wish to court the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution." 667 F.2d 188, 193 (D.C.Cir.1981). *See also Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ("We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.") (quoting *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)).

In my view, the requisite "clear and convincing" evidence of intent is absent here. As my colleagues acknowledge, section 372(c)(10) contains no language expressly barring constitutional challenges. *See* Maj. Op. at 59–60. Indeed, Congress knows how to preclude review of constitutional claims when it wants to. For example, the federal statute governing deportation and denaturalization provides that "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions,* ... shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added).

In *Ungar* as well as in *Ralpho v. Bell,* we found statutes containing language just as preclusive as section 372(c)(10)'s insufficient to bar review of as-applied constitutional claims. The statute in *Ungar* provided that administrative decisions are "final" and "not ... subject to review by any court." 667 F.2d at 193 (internal quotation marks omitted). In *Ralpho,* the statute provided that "[administrative decisions] shall be final and conclusive for all

purposes, notwithstanding any other provision of law to the contrary[,] and not subject to review." 569 F.2d 607, 613 (1977). Using equally preclusive language, section 372(c)(10) provides that "[a]ll orders and determinations [of the Judicial Conference] ... shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." 28 U.S.C. § 372(c)(10).

As my colleagues also note, *see* Maj. Op. at 59–60, absent express statutory language, our prior opinions have "studied the legislative history" in search of a "clear expression of Congress's desire to prevent the courts from passing upon ... constitutional claims," *Ungar,* 667 F.2d at 196, or an "affirmative statement addressed to preclusion of *constitutional* claims." *Griffith,* 842 F.2d at 494. Here, as in *Ralpho, Ungar,* and *Griffith,* the legislative history includes no direct comment at all about whether the Act's review preclusion language was meant to cover constitutional challenges. *See* Maj. Op. at 59–60 ("Of course if the [*Griffith*] trilogy is read to require magic words expressly barring as applied constitutional attacks, they are not to be found.").

Lacking a clear affirmative statement in the statute's text or legislative history, my colleagues infer from the defunct Senate version of the Act and its accompanying legislative history that Congress intended the preclusion clause to cover as-applied constitutional challenges. *See* Maj. Op. at 59–63. Although this is certainly a plausible interpretation of the legislative history, both *Griffith* and *Ungar* declined to treat such inferences from prior versions of bills as sufficiently clear evidence of congressional intent to preclude judicial review of as-applied claims. In *Griffith,* the original Senate bill provided that most decisions of the Federal Labor Relations Authority would be "final and conclusive" and not subject to further judicial review, but provided an exception for "questions arising under the Constitution." 842 F.2d at 495. The conference committee, rejecting the House's proposal for expansive judicial review and generally adopting the Senate's more restrictive approach, dropped "without explanation" the exception for constitutional questions. *Id.* Nevertheless, observing that circuit precedent required an "affirmative statement addressed to preclusion of *constitutional* claims," *id.* at 494, we held that "[t]his silent deletion [was] not enough, under our cases, to support an inference of intent to preclude constitutional claims." *Id.*

The statute at issue in *Ungar* provided that Justice Department decisions regarding claims for the return of assets vested in the Office of Alien Property were not subject to judicial review. Deciding that this provision did not preclude review of as-applied constitutional claims, we noted that "[a]n earlier version of the bill ... included an elaborate scheme for trial of just-compensation claims in the Court of Claims," which was "deleted on the House floor for reasons that are not wholly plain." We were nonetheless "not willing to regard this as clear evidence of Congressional intent...." 667 F.2d at 195 n. 2.

The evidence of legislative intent to preclude judicial review that we declined to credit in *Griffith* and *Ungar* was, if anything, stronger than in this case. In those cases, we found legislative history insufficiently clear and convincing to preclude as-applied challenges even though the original versions of the statutes at issue allowed review of constitutional questions, while the final versions eliminated such provisions, suggesting a movement *toward* precluding such review. Here, by contrast, the legislative history suggests movement *away* from preclusion. Senator DeConcini, one of the Act's primary spon-

sors, introduced a Report prepared by Johnny H. Killian, an American law specialist at the Library of Congress, suggesting that under Supreme Court precedent, Congress can safely preclude judicial review of constitutional claims so long as "litigants at some point [have] access to an Article III court." 125 CONG. REC. 30,050 (1979) (statement of Sen. DeConcini). Senator DeConcini's bill provided for review of disciplinary decisions by a newly created, five-judge Article III Court of Judicial Conduct and Disability. *Id.* Later House revisions shifted review from the five-judge court to the Judicial Conference. In doing so, the House Judiciary Committee emphasized that it was moving from a "court" to an "administrative model." *Compare* H.R. REP. No. 96–1313, at 4 (1980) ("[R]ather than creat[ing] luxurious mechanisms such as special courts and commissions—with all the trappings of the adversary process, including legal counsel, written transcripts, discovery and cross examination—the [House version of the bill] emphasize[s] placing primary administrative responsibility within the judicial branch of government."), *with id.* at 14 (stating that this "legislation creates much more of an 'inquisitorial-administrative' model than an 'accusatorial-adversary' one"). When the Act returned to the Senate, Senator DeConcini made the same point, explaining to his colleagues that the Judicial Conference, unlike the five-judge court proposed in the Senate version of the bill, was "not an independent review court." 126 CONG. REC. 28,090 (1980) (statement of Sen. DeConcini, quoting the Killian Report); *see also Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 86 n. 7, 90 S.Ct. 1648, 26 L.Ed.2d 100 ("[T]he Judicial Council was intended to be . . . an administrative body functioning in a very limited area in a narrow sense as a 'board of directors' for the circuit."). Because Congress had been informed by the Killian Report that it could safely preclude review of constitutional questions only if such review was available in an Article III court, and because it had also been advised by both Senator DeConcini and the House Judiciary Committee that the Judicial Conference was not an Article III court, Congress would have understood that vesting power to review disciplinary decisions in the Judicial Conference opened those decisions to constitutional attack in the federal courts.

Under all of these circumstances, I do not see how the evidence of Congress's intent to preclude as-applied constitutional challenges can be considered clear and convincing—or, as we required of legislative history in *Griffith,* "unusually clear." 842 F.2d at 494. Not only did both *Griffith* and *Ungar* find similar inferences from legislative history insufficient to meet the clear and convincing standard, but in this case, there is an equally plausible—if not more plausible—interpretation of the legislative history that suggests Congress did *not* intend to preclude review of as-applied constitutional challenges.

My colleagues' observation about "substantial redundancy" between review performed by the Judicial Conference and Article III courts, *see* Maj. Op. at 62–63, is interesting, but I think not dispositive. For one thing, while it is true that the two forms of review are both performed by Article III judges, I do not agree that they are entirely redundant: decisions of Article III courts are reviewable on certiorari by the Supreme Court, a distinction of particular importance given the constitutional interests at stake here. Even assuming they were identical, moreover, such functional redundancy would be convincing evidence of Congressional intent only if it were the sole form of evidence available, and it isn't. In view of Senator DeConcini's statement and the House Ju-

diciary Committee Report, Congress most likely thought shifting review from an Article III court to the Judicial Conference opened decisions of the latter to as-applied constitutional challenges in the federal courts. In my view, this primary evidence of legislative intent outweighs any inferences that might be drawn from whatever functional redundancy may exist.

Finally, my colleagues believe that preclusion of constitutional claims would serve the statutory purpose of "prevent[ing] undue prolongation of the disciplinary process." Maj. Op. at 62–63. But we have twice found review preclusion statutes designed to accomplish similar goals insufficient to establish clear congressional intent to bar review of as applied constitutional claims. See Griffith, 842 F.2d at 495 (Congress's scheme to limit judicial review of FLRA decisions was meant to promote "finality, speed[,] and economy," and thus barred district court review of FLRA decisions on statutory grounds, but review of as-applied constitutional claims nonetheless was not precluded); Ungar, 667 F.2d at 195–96 (legislative history indicating that review preclusion provision was "intended to reduce . . . delay in adjudicating claims under the Trading with the Enemy Act" was not a "clear expression of Congress's desire to prevent the courts from passing upon . . . constitutional claims").

## III

Having found no "clear and convincing" evidence that Congress intended to preclude review of as-applied constitutional challenges to judicial council sanctions, I would have considered the merits of Judge McBryde's as-applied claims. In addition to the challenges discussed by the court, see Maj. Op. at 64–68, Judge McBryde raises the question whether the Judicial Council unconstitutionally interfered with

his judicial independence by punishing him because it disagrees with his judicial philosophy and acts: "Purportedly pursuant to the Act, defendants investigated Judge McBryde's performance of his judicial functions, requiring him to defend his performance and disrupting his judicial activities. They then punished him, and changed his judicial status, because they disapproved of his judicial performance, depriving him of all new cases for one year . . . and issuing a damning public reprimand. Does the Act violate the judicial independence doctrine of Article III on its face and as applied?" Appellant's Opening Br. at 2. Answering this question, Judge McBryde argues that "the Constitution does not allow agencies to supervise his judging, disagree with his rulings, and punish him because his rulings do not meet some 'norm' of acceptable judicial conduct." Id. at 52–53. The Judicial Conference disagrees: "Given the conduct engaged in and the adverse effects on the judicial system in Fort Worth, Texas, that conduct had, Appellees submit that it was not unconstitutional to suspend assignment of new cases for up to one year for [the Judge] to reflect and to change his conduct." Appellees' Br. at 68–69.

I agree with my colleagues that the principle of judicial independence does not "constitutionally shelter[ ]" Judge McBryde from "sanctions of every sort." Maj. Op. at 65. I also agree that the creation of a mechanism enabling Judicial Councils to sanction judges for things that happened when they were "acting and deciding cases" or engaged in some other "phase of the decisional function" does not render the Act facially unconstitutional. Cf. Chandler, 398 U.S. at 85, 90 S.Ct. 1648 ("Many courts—including federal courts— have informal, unpublished rules. . . . These are reasonable, proper, and necessary rules, and the need for enforcement

cannot reasonably be doubted. [I]f one judge in any system refuses to abide by such reasonable procedures, it can hardly be that the extraordinary machinery of impeachment is the only recourse."). For reasons I will explain, however, I do believe that the principle of judicial independence permits sanctions to be imposed only for conduct that is *clearly* abusive or *clearly* prejudicial to the adversarial process, and in this case, I think that Judge McBryde's conduct, as described in the Council's Report, does not uniformly meet this standard.

As an initial matter, I believe the principle of judicial independence guarantees to individual Article III judges a degree of protection against interference with their exercise of judicial power, including interference by fellow judges. As my colleagues note, the Supreme Court expressly stated in *Northern Pipeline* that the constitutional guarantee of life tenure "insulates the individual judge from improper influences not only by other branches but by colleagues as well, and thus promotes judicial individualism." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 59 n. 10, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Similarly, in *Chandler,* a case involving intrajudicial discipline, the Supreme Court stated that "[t]here can, of course, be no disagreement among us as to the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function." 398 U.S. at 84, 90 S.Ct. 1648. *See also In re Certain Complaints Under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit,* 783 F.2d 1488, 1506–07 (11th Cir.1986) (noting, in the context of adjudicating the facial constitutionality of certain provisions of the Act, that "the majority [in *Chandler*] located a judge's protected independence ... 'in deciding cases or in any phase of

the decisional function,' " and then framing its basic inquiry as "whether [the] direct or indirect effects ... the Act may have on an individual judge's independence are within proper tolerances").

The notion that individual judges enjoy a sphere of protected independence finds support in the cases establishing that judges cannot be held liable for damages arising out of performance of their judicial duties. "[I]t is a general principle of the highest importance to the proper administration of justice," the Supreme Court stated in *Bradley v. Fisher,* "that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful." 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871). Similarly, in *Pierson v. Ray,* the Court stated that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction.... This immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *Cf. Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) ("Under the Federal Constitution the essential prerogatives of the trial judge as they were secured by the rules of

the common law are maintained in the federal courts.").

Of particular relevance to this case, I believe the sphere of individual judicial independence—the protected "decisional function," as *Chandler* puts it, 398 U.S. at 84, 90 S.Ct. 1648—includes not only judges' freedom to reach their own conclusions about questions of fact and law, but also a margin of discretion to manage and control the adversarial process within their courtrooms. "Courts of justice," the Supreme Court has explained, "are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates. These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal citations and quotations omitted). And as we have recognized, the exercise of this power requires that "a district judge ha[ve] wide discretion in monitoring the flow of a criminal trial. It is well within her discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.... There is a 'modicum of quick temper that must be allowed even judges.'" *United States v. Donato*, 99 F.3d 426, 434 (D.C.Cir.1997) (quoting *Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 99 L.Ed. 11 (1954)).

A judge's authority to control the courtroom is essential to the exercise of judicial power. Unlike legislative and executive power, the judicial power created by Article III can be exercised only on the basis of a factual record developed pursuant to established standards of relevance and authenticity. *See* Fed.R.Evid. 402 (requiring that evidence be relevant to be admissible), 901 (requiring that evidence be authentic to be admissible). Critical to the development of a proper record is a well-functioning adversarial process in which lawyers serve both as zealous representatives of their clients and as officers of the court with responsibilities for fairness and disclosure that transcend their clients' interests. Unless judges can manage this process, if necessary by using both formal and informal disciplinary measures to ensure that lawyers perform their dual functions effectively and in accordance with established rules of practice and procedure, they may lack the fully developed record needed to exercise their judicial authority.

Judges' power to control the adversarial process, of course, is not absolute. Inappropriate trial management, for example, can undermine a trial's fairness. *See, e.g., Offutt*, 348 U.S. at 17, 75 S.Ct. 11 (explaining that trial judge's becoming personally embroiled with defense counsel compromised the court's "atmosphere of austerity" that is "consonant with a fair trial"); *Donato*, 99 F.3d at 430–31 (finding that judge's failure to provide counsel with bench conference outside the jury's presence violated Federal Rule of Criminal Procedure 30 and constituted prejudicial error); *Santa Maria v. Metro–North Commuter RR*, 81 F.3d 265, 273 (2d Cir. 1996) (finding that a trial judge's expressed antipathy toward and removal of trial counsel sufficiently prejudiced a defendant so as to require a new trial). A judge's abusive treatment of attorneys can prevent them from effectively defending their clients' interests. *See In re McConnell*, 370 U.S. 230, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962) ("While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom ... it is also essential to

a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases."). Abusive treatment of lawyers can undermine the judiciary's reputation, threatening its integrity in the eyes of the public. *Cf. In re Certain Complaints*, 783 F.2d at 1507 ("The judiciary as a whole ... has a interest in seeing that non-frivolous complaints are looked into, to the end that the judge, and the system he exemplifies, be exonerated or, if not that the public perceive that the system has undertaken to police itself, within constitutional limits, of course."); S. REP. No. 96–362, at 7 (1979), *reprinted in* 1980 U.S.C.C.A.N. 4315, 4321 ("The perception of a viable healthy judiciary is of critical importance to our system of justice."). As the Supreme Court has said, "an independent judiciary *and* a vigorous, independent bar are *both* indispensable parts of our system of justice." *McConnell*, 370 U.S. at 236, 82 S.Ct. 1288 (emphasis added).

It is thus appropriate for Judicial Councils, acting pursuant to their general disciplinary power under section 372(c), to ensure that judges' trial management techniques do not interfere with the "effective and expeditious administration of the business of the courts." 28 U.S.C. § 372(c)(1). After all, Congress has authority to "limit[ ]" courts' inherent powers—including their power to manage trials—"by statute and rule, for these courts were created by act of Congress." *Chambers*, 501 U.S. at 47 (internal quotation marks omitted); *see, e.g., McConnell*, 370 U.S. at 233–34, 82 S.Ct. 1288 (noting that Congress has limited courts' inherent powers to sanction attorney contempt by requiring such sanctions to be no more severe than necessary).

This does not mean that Congress may infringe—or authorize Judicial Councils to infringe—upon judges' trial management

authority in any manner it sees fit. It is a familiar principle that even though Congress has the power to create lower federal courts and organize their functioning in certain respects, it can neither interfere with nor alter essential features of their operation. *See, e.g., Plaut v. Spendthrift Farm*, 514 U.S. 211, 240, 115 S.Ct. 1447, 131 L.Ed.2d 328 (holding that Congress may not pass legislation that reopens final judgments of federal courts). Having vested authority to conduct trials in individual district judges, Congress cannot grant Judicial Councils the power to interfere with those judges' trial management authority to such an extent that judges cannot exercise it effectively. *Cf. In re Holloway*, 995 F.2d 1080, 1088 (D.C.Cir. 1993) (observing that absent a judge's ability to control a trial with enforceable sanctions, "trials would wander down every byway, no matter how impermissible, in a sprawling chaos that would render the adjudication close to random. In the long run, such chaos is hardly in the interests of defendants as a whole, much less in the interest of society."). Congressional delegation of such authority would also violate the principle of separation of powers, which prevents not only the aggrandizement of one branch of government at the expense of another, but also the disruption by one branch of another's essential functions. *See Morrison v. Olson*, 487 U.S. 654, 675, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (noting that "separation-of-powers concerns ... would arise" if Congress's power to provide for interbranch appointments of inferior officers "had the potential to impair the constitutional functions assigned to one of the branches"); *Mistretta v. United States*, 488 U.S. 361, 404, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (stating that the "ultimate inquiry" whether executive appointment of Article III judges to administrative posts violated separation of powers principles turned on

whether the "particular extrajudicial assignment undermines the integrity of the Judicial Branch").

Thus, while I agree that in order to discourage the improper use of judicial power, protect the fairness of trials, and safeguard the integrity and reputation of the judiciary, it is appropriate to allow judicial councils to sanction judges for abusing their trial management power, I also believe that, to prevent such disciplinary action from encroaching upon legitimate and necessary uses of that power, such sanctions should be employed only for conduct that, viewed from the perspective of reasonable judges and lawyers, is *clearly* abusive toward counsel or *clearly* prejudicial to the adversarial process.

A rigorous standard of this kind is essential for several reasons. First, absent such a standard, judicial councils could more easily use their disciplinary authority to sanction nonabusive judicial behavior. Federal judges are not all alike: there are as many appropriate courtroom management techniques as there are judges. In any given situation, moreover, there will generally be more than one appropriate way to manage a trial or demand attorney compliance with court orders and rules. One judge may use a light touch to get an aggressive lawyer to end an entirely inappropriate line of questioning; another judge may threaten sanctions. Allowing judges to punish each other absent evidence of clear abuse of counsel or clear damage to the adversarial process risks turning judicial discipline into a vehicle for sanctioning stylistic disagreements over trial techniques.

Second, some Judicial Council members, such as appellate judges, may have little or no experience dealing with aggressive trial lawyers who routinely test the limits of proper advocacy. To such judges, the trial management techniques needed to control these lawyers may seem harsh, even abusive. A rigorous standard that restricts sanctions to instances of clearly abusive behavior will reduce the likelihood that councils will sanction appropriate behavior out of inexperience. And quite apart from the problem of inexperience, even judges can act unfairly—indeed vindictively—towards colleagues. A rigorous standard will reduce, though of course it cannot eliminate, the possibility that judicial discipline will be used to sanction unpopular judges engaged in appropriate behavior.

Third, judicial discipline, like civil liability for judicial acts, can chill the proper exercise of judicial discretion. *See Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (holding that imposing civil liability for acts committed to judicial discretion "would contribute not to principled and fearless decisionmaking but to intimidation"); *cf. Williams v. United States,* 156 F.3d 86, 91–92 (1st Cir.1998) ("If chastened attorneys can enlist appellate courts to act as some sort of civility police charged with enforcing an inherently undefinable standard of what constitutes appropriate judicial comment on attorney performance, trial judges are more likely to refrain from speaking and writing candidly. In our view, this chilling effect carries with it risks that are far greater than those associated with the evil of occasional overheated judicial commentary."). If judges can be sanctioned for conduct that is only arguably or possibly—as opposed to clearly—abusive, they may be reluctant to employ stern measures even when necessary to keep control of the adversarial process. This is especially true because a trial judge's harsh words or tough sanctions, entirely appropriate in the heat of a tense and hard-fought trial, may seem abusive when viewed in retrospect through the pages of a cold record.

The possibility of chilling legitimate judicial behavior also means that, in cases like this one where judges are sanctioned in part for the effect their behavior has on lawyers who practice before them, judicial councils should apply an objective standard, asking not just what complaining lawyers felt, but also how the judge's conduct would have affected *reasonable* lawyers under similar circumstances. It is only natural for lawyers to feel slightly constrained and irritated when judges try to control them. If judicial councils fail to apply an objective standard when evaluating lawyer reactions and complaints, judges might fear discipline if enough disgruntled lawyers file complaints or testify against them. Judges might thus calibrate courtroom discipline to avoid displeasing lawyers, refraining from strict measures even when necessary and appropriate.

Finally, we have previously adopted a rigorous standard where, as here, sanctions could damage an individual's reputation. In *Shepherd v. ABC*, we held that courts cannot impose discovery sanctions based on attorney misconduct without clear and convincing evidence of the predicate wrongdoing. 62 F.3d 1469, 1476–78 (D.C.Cir.1995); *see also Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (U.S.1979) (stating that reputational interests "are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof"). If, because of the risk of imposing reputational harm, Article III courts must apply a heightened standard when sanctioning lawyers, a similar obligation should apply to judicial councils when considering disciplining fellow judges. Suspensions and, in particular, reprimands can cast long–lasting shadows over a judge's career.

I recognize that under a heightened standard, some abusive judicial conduct may be unsanctionable. Confining the disciplinary process to clear abuses of judicial power, however, would not eliminate all means of dealing with less abusive conduct. Judges address such conduct informally and collegially, and the President and Senate try to ensure that judicial nominees possess the appropriate temperament to serve as life-tenured federal judges. Although such efforts may be imperfect, it seems far wiser to tolerate some inappropriate judicial conduct than to risk chilling appropriate judicial conduct throughout the federal judiciary.

With these principles in mind, I return to the facts of this case.

## IV

Several incidents described in the Council's Report, such as the episode my colleagues recount, *e.g.,* Maj. Op. at 67–68, are so extreme and clearly abusive that, as the Special Committee concludes in one instance, they speak for themselves. *See* Report at 23 ("No more need be said with regard to this incident."); *see also, e.g., id.* at 26–30 (describing Judge McBryde's sanctioning the entire Federal Public Defender's Office because a single attorney could not be reached for forty-five minutes due to a misunderstanding); *id.* at 51–55 (describing Judge McBryde's berating an Assistant United States Attorney and holding him in contempt of court because a secretary had trouble connecting all of the parties to a conference call); *id.* at 55–59 (describing Judge McBryde's jailing an Assistant Public Defender who refused to answer a question he believed might compromise attorney-client privilege); *id.* at 60–65 (describing Judge McBryde's removing a state court judge from McBryde's chambers without inquiring why the state court judge was there). Had the Council

restricted its report to incidents like these, I would have no trouble rejecting Judge McBryde's as-applied challenge, for no reasonable judge would think behavior like this appropriate.

Not all of the conduct described in the Report, however, falls so clearly outside the bounds of appropriate judicial behavior. The Report's main deficiency is that it never adequately explains how such apparently less abusive conduct—ranging from the "cat-and-mouse" comment to accusations of lawyer bad faith to Judge McBryde's trial practice rules—amounts to a clear abuse, or in some instances even an abuse at all, of judicial power. The Report itself acknowledges that at least one incident was "fairly trivial," but suggests that "along with other incidents" it was "illustrative of a pattern of conduct." *Id.* at 23. I recognize that trivial conduct that would not be abusive if it happened once might become so if repeated consistently over time. I also understand that intra-judicial discipline may be an important means of addressing patterns of behavior that cannot be corrected through informal mechanisms or appellate review. *See id.* at 122; Carol Rieger, *The Judicial Councils Reform and Judicial Conduct and Disability Act: Will Judges Judge Judges?*, 37 EMORY L.J. 45, 78–80 (1988). That said, it is not at all clear to me that the more trivial incidents the Report describes, even if they occurred persistently, amounted to abuses of judicial power. For example, I think it not at all obvious that a judge who consistently employed phrases like "cat-and-mouse approach to discovery," had difficult relations with colleagues, or was "not always solicitous of his fellow judges' needs or feelings" in the use of courtrooms, would be guilty of abusing his judicial power. Although I understand the Committee's desire to include a sufficient number of incidents to establish patterns of conduct, because I think that judicial

discipline must not interfere with judicial independence, the Committee should have restricted its Report to incidents that, if occurring repeatedly, would represent clear abuses of judicial power. As it stands, the Report leaves unclear whether the patterns formed by these more trivial incidents were at all abusive, let alone clearly abusive. If they were abusive, the Committee failed to explain why. The Report thus leaves open the possibility that Judge McBryde was sanctioned in part for legitimate judicial behavior. And absent an explanation of how such conduct constitutes a clear abuse of judicial power, imposing sanctions based on this record risks chilling legitimate conduct by other judges.

In the second category of incidents presented in the Report—those involving conduct that, although more clearly bordering on the abusive, might nonetheless be entirely appropriate under some circumstances, *see supra* at 71—I think the Committee similarly failed to explain adequately what made Judge McBryde's conduct clearly abusive, and thus sanctionable. Consider, for example, the Report's description of instances in which Judge McBryde accused attorneys of bad faith. According to the Report, these incidents form a pattern that reveals Judge McBryde's "proclivity to question the integrity of attorneys appearing before him." Report at 124. Yet the Committee fails to establish that these incidents, taken together, were clearly abusive. Much of the Report's discussion simply recounts that on several occasions Judge McBryde "exhibited distrust of attorneys' motives" and "often directly accus[ed] them of lying or conspiring to deceive him." *Id.* at 124–25. This in itself is unremarkable, since evaluating attorney good faith is one of a trial judge's functions.

The Report does suggest, however, that what sets these incidents apart is that

Judge McBryde's suspicions were "unfounded," *id.* at 150, and that the Judge had "refus[ed] to take simple steps to verify whether or not his suspicion of bad faith on the part of others [was] justifiable." *Id.* at 126. I agree that a pattern of consistent, unfounded accusations of bad faith might well represent a clear, sanctionable abuse of judicial power. In explaining why these accusations were "unfounded" or otherwise problematic, however, the Committee gives little or no weight to how things would have looked to an objectively reasonable judge in Judge McBryde's position. In one case, for example, the Report states that "[w]e believe [that an attorney accused of bad faith] told the Special Committee the truth" when he testified that he had not lied to Judge McBryde, Report at 17 n.4; yet the Report never explicitly says whether Judge McBryde himself lacked any reasonable basis for believing the lawyer was deceiving him. Likewise, when describing the *Torres* incident, the Report criticizes Judge McBryde's treatment of the clerk of the court without considering whether the Judge had a reasonable basis for thinking the clerk's conduct verged on contempt. *See id.* at 72–78; *cf. In re McBryde,* 117 F.3d 208, 219 (5th Cir.1997) ("Judge McBryde's understanding of the factual basis for suspecting that Clerk Doherty was on the verge of contempt was similarly within the bounds of reason."). How can conduct amount to a clear abuse of judicial power unless that conduct seemed abusive to an objectively reasonable judge? Put differently, it seems absurd to say that conduct is clearly abusive if a reasonable judge under the circumstances would have thought it appropriate.

The Report's discussion of the manner in which Judge McBryde enforces his trial rules is similarly flawed. I agree that if a judge "imposes unduly stringent rules on advocates and enforces these rules in an often harsh manner," and if as a result those rules "so restrict cross-examination that they impede the effective administration of justice," that conduct should be sanctionable. Report at 116. Yet the Report's description of Judge McBryde's rules and their enforcement includes many phrases and characterizations that encompass perfectly legitimate trial practices: Judge McBryde's cases are "replete with [the Judge's] constant admonishments to counsel to move on to something else; not to allude to a stipulated fact; and orders to (or threats to order) lawyers to sit down during openings of the examination of witnesses," *id.* at 110; "Judge McBryde ultimately uses the threat of contempt and sarcasm to enforce his rules," *id.* at 111; "[t]he Committee heard numerous additional examples of Judge McBryde's interrupting a lawyer during the questioning of a witness or conduct of the trial to enforce one or more of his rules, sometimes in a harsh, threatening, or sarcastic manner," *id.* at 113. To be sure, the Report also states that the Committee was "fully cognizant of the notion that a trial judge should be afforded broad discretion to manage and conduct trials," and that Judge McBryde's "extreme and unduly restrictive rules" and manner of enforcement were "different not only in degree but also in kind from the wide array of acceptable trial management rules." *Id.* at 121–22. But simply stating this conclusion provides insufficient guidance about why in Judge McBryde's case "admonishments to counsel to move on," "the threat of contempt and sarcasm," or other routine conduct amounted to a clear abuse of judicial power. Because this section of the Report contains too much general language that could describe any judge's appropriate courtroom conduct, resting sanctions on these descriptions could chill the legitimate exercise of judicial power.

The Council failed in other ways to take sufficient account of the Report's chilling effect. In its discussions of Judge McBryde's accusations of attorney bad faith, for example, the Report never acknowledges that judges must often assess attorney good faith, or that it is not necessarily out of order for a judge to attempt to send a message to an entire office that has given him problems in the past. *See Bonds v. District of Columbia,* 93 F.3d 801, 805 n. 7 (D.C.Cir.1996) ("If they [the District's counsel] don't show, you proceed without them. If the witnesses don't show, I'll hold them in contempt. That's the only way I can deal with the District of Columbia Government these days.") (quoting trial transcript). Nor does the Report sufficiently acknowledge that district judges need a reasonable margin of error in making findings of bad faith, especially when presiding over tense trials calling for quick decisions to control the behavior of aggressive lawyers. Nor, finally, does the Report recognize that assessments of attorney bad faith are not necessarily abusive even if later set aside on appeal. *See* Report at 14–15 ("The Fifth Circuit ... noted that there was no evidence of bad faith on the [accused party's] part."). To avoid chilling appropriate judicial conduct, I think the Committee should have explained more thoroughly and more explicitly how Judge McBryde's behavior differed from permissible exercises of judicial power.

The Council's insensitivity to the potentially chilling effect of its Report is likewise apparent in its discussion of the impact Judge McBryde's behavior had on others. Describing the effect of Judge McBryde's enforcement of his trial rules upon the adversarial process, as well as the impact of the Judge's abusive treatment of attorneys upon the Fort Worth legal community as a whole, the Committee often seems to credit the views of witnesses who testified before it without ever determining whether those views represented what reasonable lawyers would have felt in similar circumstances. The Report explains, for example, that the prosecutor Judge McBryde accused of using a "cat-and-mouse approach to discovery" left legal practice in part as a result of that incident, quoting at length the attorney's explanation of why the threat of Judge McBryde's treatment led him to leave his job. *See* Report at 51. Similarly, the Report cites the testimony of numerous lawyers who stated that they felt oppressed, harassed, afraid to ask questions, and generally unable to function effectively in Judge McBryde's courtroom. *See id.* at 116–21, 132–37.

I agree that a judge whose harsh management of trials makes it impossible for lawyers to practice in front of him creates a serious problem. I also understand that proving that a judge had such an effect requires testimony from lawyers who practice before the judge. But in examining the testimony of such lawyers, the Committee should have attempted to discern not simply whether Judge McBryde had a disruptive effect on the Fort Worth legal community, but also whether his conduct would clearly prejudice the ability of reasonably resilient and thick-skinned lawyers to present their cases effectively.

In sum, I have no doubt that several of Judge McBryde's actions were clearly sanctionable: they were flagrant abuses of judicial power. In its understandable desire to be thorough, however, the Committee included in its Report many actions and incidents which either seem to be entirely appropriate or involve conduct that might have been appropriate under some circumstances. I understand that even actions which are not obviously and flagrantly abusive on their face can be abusive either in context or as part of a pattern.

Because of the fundamental importance of judicial independence and the risk that sanctions could punish or chill legitimate judicial behavior, however, I think that sanctioning such conduct requires judicial councils to explain precisely how and why it rises to the level of a clear abuse of judicial power. Here, the Committee's Report falls far short of this standard. I would therefore have remanded the case to the Council with instructions to limit its Report to evidence that, when viewed objectively, demonstrates a pattern of conduct that amounts to a *clear* abuse of judicial power, or a pattern of conduct *clearly* prejudicial to the adversarial process, and then in light of this sharpened record, to re-evaluate the appropriateness of the sanctions and to impose those sanctions deemed necessary to deter future misconduct by Judge McBryde and other judges and to preserve the reputation and integrity of the federal judiciary.

## V

Because my colleagues recognize that Judge McBryde's challenge to the reprimand is not moot, the substance of the foregoing analysis is largely unaffected by their view that his challenge to the suspensions *is* moot. But because under my colleagues' theory of mootness, a judge suspended for only a few years but not reprimanded would never be able to challenge the suspension, I respectfully register my disagreement with this aspect of the court's opinion. In my view, Judge McBryde's challenge to his suspensions is not moot for two independent reasons. First, the suspensions—which remain published on the Fifth's Circuit's web site, *see* http://www.ca5.uscourts.gov/mcbryde/council.htm (last visited Sept. 6, 2001)—give rise to ongoing stigmatic and reputational injury at least as serious as that of the reprimand. Second, Judge McBryde raises an issue that seems "capable of repetition yet evading review." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Although this court's opinion puts Judge McBryde on notice that his peers can constitutionally sanction him for some inappropriate in-court conduct, *see* Maj. Op. at 68, the opinion leaves unclear precisely what kind of conduct would trigger sanctions. The court never decides whether it was constitutional for the Judicial Council to have sanctioned Judge McBryde for the conduct described in the Report, and I do not think informing Judge McBryde in the abstract that he must give his colleagues at least a "modicum of civility and respect," *id.*, provides much guidance about what kind of conduct is constitutionally sanctionable. Thus, even assuming that Judge McBryde accepts the court's conclusion that his peers can punish him for *some* in-court conduct, he will not know whether it is constitutional for his peers to sanction him for behavior like that described in the Report. *See* Report at 59 (stating that Judge McBryde believed his incarceration of a lawyer for refusal to answer a question was "appropriate under the circumstances"); *id.* 63–64 (quoting transcript of Committee hearing suggesting that Judge McBryde thought it was appropriate under the circumstances to have a state court judge removed from his chambers without asking the state judge why he had come to see Judge McBryde). Given this uncertainty, and given Judge McBryde's aggressive judicial style, there is ample reason to suspect that his behavior might again provoke sanctions.